Judge Jorge L. Alonso
Magistrate Judge Daniel P. McLaughlin
Cat 2/ Random Assignment
**MR**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

BROWN WASHINGTON TRUST,

by Kimberly Jean Brown, its Assignee,

    Derivative Plaintiff,

       and,

KIMBERLY JEAN BROWN, individually,

    Plaintiff


       vs.


SCOTT GARTNER; MICHAEL

GREEBY; LILA GOLDSTON;

ADAM KINGSLEY; JOHN KOHT;

MICHELLE MONTGOMERY;

STORM VASKE;

 ERIKA WILLIAMS;

    ("Individual Defendants");

      and,

GRAND PRIX PRINTING, LLC;

HUGE LEGAL TECHNOLOGY COMPANY

INC; JAMES D. MONTGOMERY &

ASSOCIATES, LTD; JP MORGAN

CHASE CO; KINGSLEY LAW GROUP;

KOHMEDIA LLC, LILA GOLDSTON

CONSULTING LLC; MERIT LAW GROUP;

    ("Corporate Defendants")

**COMPLAINT**

Case No.

DEMAND FOR
JURY TRIAL

**Jurisdiction by**
**Federal Question**
**18 U.S.C.§1961-1962**
Violations: Racketeer
Influenced and
Corrupt Organizations

**RECEIVED**

DEC 20 2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

LEGACY COMPLETE LLC

    ("Derivative Defendant")

## COMPLAINT

Derivative Plaintiff, BW Trust, through its assignee, Kimberly Jean Brown, and Plaintiff, Kimberly Jean Brown, individually (together "Plaintiffs"), demand a trial by jury on all issues so triable and, for their complaint against Defendants Scott Gartner, Michael Greeby, Lila Goldston, Adam Kingsley, John Koht, Michelle Montgomery, Storm Vaske, Erika Williams, Grand Prix Printing. LLC, James D. Montgomery & Associates, LTD, JP Morgan Chase Co, Kingsley Law Group, Kohmedia LLC, Lila Goldston Consulting LLC, Merit Law Group, alleges the following:

## BASIS FOR JURISDICTION AND VENUE

1) This matter includes allegations of violations of the Racketeer Influenced and Corrupt Organizations Act and the Court has jurisdiction of this matter under 18 U.S.C. § 1961-1962.

2) Venue in this judicial district is proper under 28 U.S.C. §1391 as a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District.

2

3) On information and belief, each Defendant is subject to this Court's general and specific personal jurisdiction. All Individual Defendants except Storm Vaske and Erika Williams are citizens of the state of Illinois. Each Individual Defendant and Corporate Defendant (collectively, "Defendants") has sufficient minimum contacts within the state of Illinois and this District, pursuant to due process and/or the Illinois Long Arm Statute, because each Defendant purposefully availed itself of the privileges of conducting business in the state of Illinois and in this District, because each Defendant regularly conducts and solicits business within the state of Illinois and within this District, and because the Plaintiffs' causes of action arise directly from Defendants' activities in the state of Illinois and this District.

4) This complaint is related to, and a refiling of, Brown v. Gartner, 1:20-cv-05195, which was filed in Illinois Northern District Court on September 2, 2020 and was dismissed for lack of subject matter jurisdiction. The Seventh Circuit Court of Appeals affirmed the dismissal on December 21, 2023. Ms. Brown is filing this complaint within one year of the Seventh Circuit's affirmation of the dismissal.

5) Derivative Defendant, Legacy Complete ("Legacy"), was originally a limited liability company established under Nevada law. However, the limited liability company designation was

3

administratively dissolved in 2017 for failure to pay the annual fee to the Nevada Department of Business Services. Legacy is owned 75% by the BW Trust and 25% by the Charles V. Hamilton Living Trust (together, Dr. Charles V. Hamilton and his Living Trust are referred to as "Dr. Hamilton"). Legacy's mailing address is 1026 E. 46th St, 2E, Chicago, IL. 60653. Legacy is a derivative defendant and this suit is brought on behalf of the owners of Legacy.

6) Derivative Plaintiff BW Trust is the derivative plaintiff acting on behalf of Legacy as Legacy is financially unable to initiate the lawsuit. BW Trust is organized under Illinois law and Ms. Brown is the trustee of the BW Trust. The BW Trust has assigned the right to pursue this suit on behalf of the BW Trust to Ms. Brown acting in her individual capacity. BW Trust's mailing address is 1026. E 46th St, Unit 2E, Chicago, Il. 60653. Since Ms. Brown is the also trustee of the BW Trust which owns 75% of Legacy, a demand on Legacy to file this derivative lawsuit is unnecessary.

7) Plaintiff Kimberly Jean Brown ("Ms. Brown") was a citizen of Illinois until 2019 and is again a citizen of Illinois. Ms. Brown resides at 1026 E 46th St, Unit 2E, Chicago, IL 60653.

8) Defendant Scott Gartner ("Defendant Gartner") is an individual and a citizen of Illinois. Defendant Gartner is currently the mayor of

4

Antioch, Illinois. Antioch's Village Hall is located at 874 Main St, Antioch, IL. 60002.

9) Defendant Lila Goldston ("Defendant Goldston") is an individual and a citizen of the state of Illinois or New York. Defendant Goldston owns and operates Defendant Goldston Consulting which is registered with the Illinois Secretary of State at 5201 S. Cornell, Unit 25D, Chicago, IL, 60615

10) Defendant Michael Greeby ("Defendant Greeby") is an individual and a citizen of Illinois. Defendant Greeby's work address is c/o Wilson Sporting Goods, 1 Prudential Plaza, 130 E. Randolph St., Chicago, IL 60601.

11) Defendant Adam Kingsley ("Defendant Kingsley") is an individual and a citizen of Illinois. Defendant Kingsley owns and operates Defendant Kingsley Firm which is registered at 2227 W. Leland Ave, Chicago, IL. 60625.

12) Defendant John Koht ("Defendant Koht") is an individual and a citizen of Illinois. Defendant Koht owns and operates Kohmedia LLC which is registered at 520 Rio Vista Rd, Glenview, IL 60025.

13) Defendant Michelle Montgomery ("Defendant Montgomery") is an individual and a citizen of Illinois. Defendant Montgomery is a

partner at Defendant Montgomery Firm which is registered at 33 W. Monroe, Suite 1375, Chicago, IL 60603.

14) Defendant Storm Vaske ("Defendant Vaske") is an individual and a citizen of Iowa. Defendant Vaske was formerly a citizen of Illinois. Defendant Vaske works for Grand Prix Printing, LLC, aka The Label Advantage, which has a registered address of 4111 NE Bellagio Circle Ankeny, IA 50021.

15) Defendant Erika Williams ("Defendant Williams") is an individual and a citizen of the state of California. Defendant Williams resides at 704 Pier View Way, Oceanside, CA 92054.

16) Defendant Grand Prix Printing, LLC, along with its aliases, is an Iowa limited liability company that merged with Bellwether Creation Company LLC, an Illinois limited liability company which was voluntarily dissolved in 2017. Bellwether Creation Company LLC, Grand Prix Printing LLC, and its aliases, are collectively referred to as "Defendant Bellwether". Defendant Bellwether provides service to customers in Illinois. Defendant Bellwether's registered officer is Kent Vaske, 4111 NE Bellagio Circle, Ankeny, Iowa 50021 and its principal place of business is 1785 Guthrie Ave, Des Monies, Iowa 50316.

6

17) Defendant Huge Legal Technology Company, Inc. ("Defendant Huge Legal") is a Delaware corporation with its principal place of business in the state of California. Defendant Huge Legal's CEO is Cody Barbo, and its principal place of business is 8605 Santa Monica Blvd, Suite 40156, West Hollywood, CA 90069-1094. Defendant Huge Legal operates TrustAndWill.com which provides services to customers in Illinois.

18) Defendant James D. Montgomery & Associates, Ltd. ("Defendant Montgomery Firm") is a law firm incorporated under the laws of the state of Illinois and has its principal place of business in the state of Illinois. Defendants Montgomery and Montgomery Firm are represented by Chris S. Wunder and Eric D. Kaplan, KAPLAN PAPADAKIS & GOURNIS, P.C., 180 N. LaSalle Street, Suite 2108, Chicago, Illinois 60601.

19) Defendant J.P. Morgan Chase ("Defendant J.P. Morgan") is a financial institution incorporated under the laws of the state of New York and has its principal place of business in the state of New York. Defendant J.P. Morgan has hundreds of locations of its financial institutions in Illinois. Defendant J.P.Morgan is represented by Patricia Brown Holmes, RILEY SAFER HOLMES & CANCILA LLP, 70 W. Madison Street, Suite 2900, Chicago, Illinois 60602.

7

20) Defendant Kingsley Law Group ("Defendant Kingsley Firm") is organized and operated under the laws of Illinois. Defendant Kingsley is the manager of Defendant Kingsley Firm which has its principal place of business at 2227 W. Leland Ave, Chicago, IL. 60625. Plaintiff believes Defendants Kingsley and Kingsley Firm are represented by Joseph R. Marconi and Samuel D. Branum, Johnson & Bell, Ltd., 33 W. Monroe St, Suite 2700, Chicago, IL 60603.

21) Defendant Kohmedia LLC ("Defendant Kohmedia") is a limited liability company incorporated under the laws of the state of Illinois. Defendant Kohmedia LLC is managed by Defendant Koht and has its principal place of business as 520 Rio Vista Rd, Glenview, IL 60025.

22) Defendant Lila E. Goldston Consulting ("Defendant Goldston Firm") is a limited liability company incorporated in Illinois. Defendant Goldston Firm is managed by Defendant Goldston and has its principal place of business at 5201 S. Cornell, Unit 25D, Chicago, IL 60615. Plaintiff believes Defendants Goldston and Goldston Firm are represented by Lee Pulliam, Lee Pulliam and Associates, P.O. Box 166, Oak Park, Il. 60303.

23) Defendant Kohmedia LLC is a limited liability company incorporated under the laws of the state of Illinois. Defendant

8

Kohmedia is manager-managed by Defendant John Koht, and has its principal place of business as 520 Rio Vista Rd, Glenview, IL 60025.

24) Defendant Merit Firm Group Inc. ("Defendant Merit Firm") is organized under the laws of Illinois and its principal place of business is in Illinois. Defendant Scott Gartner owns and operates Defendant Merit Firm which has an address of 345 Park, Suite 7, Antioch, IL 60002-1567. Plaintiff believes Defendants Scott Gartner and Merit Firm are represented by Joseph R. Marconi and Samuel D. Branum, Johnson & Bell, Ltd., 33 W. Monroe St, Suite 2700, Chicago, IL 60603.

## BACKGROUND

25) Plaintiffs alleges that through a series of events spanning nearly ten years, Defendants launched a successful disinformation campaign against Plaintiffs as a pretext for the theft of software Plaintiffs developed.

26) Plaintiff believes the software ("Legacy's Software") is being operated by Defendant Huge Legal as TrustandWill.com. Defendant Huge Legal was founded just months after Legacy's Software was commandeered. Since then, Defendant Huge Legal has raised more

than forty-eight million dollars in funding, is currently ranked #33 on the 2023 Inc 5000 list and has attracted nearly 500,000 members.

27) Plaintiff Kimberly Jean Brown ("Ms. Brown") has been a transactional attorney in Illinois for more than twenty-five years. However, due to the events described in this complaint, Ms. Brown remains licensed to practice law in Illinois, but no longer practices.

28) From approximately 2009-2017, Ms. Brown focused on living trust-based estate planning for middle-income and lower-income individuals. Living trust based estate planning was a novel concept for her clientele, as trusts were regarded as tools used exclusively by the wealthy. At the time, will-based estate planning was the norm. Other estate planning attorneys told Ms. Brown that it would be impossible to have an estate planning practice focused exclusively on living trust planning because of the increased upfront cost of living trust planning versus will-based planning.

29) Ms. Brown was committed to changing the paradigm to favor living trust-based estate planning for three primary reasons:

    A. living trust-based estate planning eliminated one of the primary reasons many individuals avoided proactive estate planning: the hesitancy to discuss their assets, or lack thereof, and,

10

    B. assets properly aligned with an individual's living trust avoid the expensive, time-consuming and public probate process.

    C. the overall cost for effective living trust-based planning is less than the overall cost for will-based planning.

30) Ms. Brown created a living trust design process that eliminated the need for the discussion of assets.[1][2] Ms. Brown would help her client:

    A. Assign appropriate healthcare and financial helpers;

    B. Create living trust "buckets";

    C. Determine what percentage of the bucket to give to each of the client's loved ones along with instructions governing the disbursement; then,

    D. teach her clients how to put their assets into, and remove their assets out of, their living trust bucket by themselves. By teaching clients how to manage the assets in their living trust, clients were able to keep their assets private and while ensuring their living trust managed their assets

---

[1]Often, clients were concerned that their loved ones would behave inappropriately if they knew what they would be receiving after their death.

[2]Ms. Brown provided potential clients with a worksheet to complete on their own to determine whether they had a taxable estate. Ms. Brown employed a separate planning process for individuals with taxable estates and those without. The overwhelming majority of her clients did not have a taxable estate.

11

31) Since the upfront cost of living trust planning is more expensive than will-based estate planning, Ms. Brown spent her first estate planning years educating the community on the benefits of living trust planning. Ms. Brown conducted approximately 50 free educational presentations each year for the initial years of her estate planning practice. Ms. Brown's practice grew based primarily on referrals from past clients, financial advisors and attendees of her presentations.

32) Ms. Brown estimates that she was retained by a dozen clients from Defendant Chase employees' referrals. To Ms. Brown's knowledge, the referred clients had only positive feedback about their experience with Ms. Brown. In fact, Defendant Chase employees often complimented Ms. Brown on the quality of her work and her strong commitment to customer service.

**Ms. Brown was referred to Dr. Hamilton**

33) One referral source from Chase referred Ms. Brown to Defendant Williams who was a financial advisor at Defendant Chase. Defendant Williams introduced Ms. Brown to her client Dr. Charles Hamilton, a prominent author, political scientist, and civil rights leader, who is Defendant Williams' client. Dr. Hamilton was in his eighties when the events described in this complaint took place.

12

34) In 2014, Ms. Brown created a living trust estate plan for Dr. Hamilton[3] and Dr. Hamilton paid Ms. Brown her normal rate for the estate plan. Pursuant to Defendant Williams' request and with Dr. Hamilton's approval, Dr. Hamilton provided a copy of Dr. Hamilton's living trust to Defendant Chase for their records.

35) In their first estate planning meeting, Ms. Brown explained the mechanics of living trust planning to Dr. Hamilton. Dr. Hamilton was unfamiliar with the concept of living trust planning but immediately became an advocate. Dr. Hamilton, who is an author, educator, activist, Ph.d. and J.D., requested Ms. Brown provide reading material on the subject.

36) Several weeks after Ms. Brown provided the requested information to Dr. Hamilton, Dr. Hamilton contacted Ms. Brown to proceed. When Ms. Brown and Dr. Hamilton met, Dr. Hamilton had completed the diagram that Ms. Brown typically completes during the planning meeting. Ms. Brown reviewed the completed diagram with Dr. Hamilton and confirmed he understood the roles and responsibilities of each.

37) For the remainder of the meeting, Dr. Hamilton discussed how best to educate his friends about living trust planning. Dr. Hamilton

---

[3] Ms. Brown was not retained to create an estate plan for Mrs. Hamilton who was residing in a nursing home at the time.

thought living trusts were the missing piece to families creating generational wealth.

38) Dr. Hamilton and Ms. Brown became friends. At the time, Ms. Brown worked two blocks from Dr. Hamilton's condo. Dr. Hamilton would often stop by her office when he was taking a walk or invite Ms. Brown to lunch. Dr. Hamilton would often have a friend or neighbor join them and Dr. Hamilton would ask Ms. Brown to give an overview of how living trusts worked. Dr. Hamilton became such an advocate of living trust planning that it was common for him to give his estate planning binder to his friends or neighbors to take home and review.

39) During one lunch in or about the fourth quarter of 2014, Dr. Hamilton stated that something was weighing heavy on him. He shared that a few days earlier, he met with a group which Dr. Hamilton referred to as the think tank ("Think Tank"). He stated that the Think Tank boasted that their members had top leadership roles at virtually every African-American civic organizations, local and national politics, judiciary, law enforcement and enterprise businesses. The Think Tank members represented to Dr. Hamilton that they had successful harnessed Black power and essentially controlled the voice of Black America.

14

40) Dr. Hamilton shared that his meeting with the Think Tank reminded him of his biggest regret during the civil rights era. Although there were significant civil rights victories, Dr. Hamilton stated that he did not feel that the entire Black community had been empowered. Instead power was concentrated in a chosen few. Dr. Hamilton shared that, more often than not, the civil rights leaders amassed power, then passed that power down to their children. Dr. Hamilton shared that having a group of powerful Black people, such as what the Think Tank claimed itself to be, is not the same as Black power he described in his book. He stated that having one select group of powerful individuals deciding what's right or wrong merely changes the oppressor. Absolute power corrupts absolutely regardless of the oppressor's skin color. Dr. Hamilton also stated that he deeply regretted not addressing the issue immediately following the civil rights era.

41) At that time, Dr. Hamilton was actively writing a book on democracy in South Africa. However, following his meeting with the Think Tank, Dr. Hamilton started outlining a book to critique the civil rights movement which he tentatively entitled Lessons Learned from the civil rights movement. Dr. Hamilton planned to include his critique of the post civil rights era along with essays from others from

15

their vantage point. Dr. Hamilton asked Ms. Brown to write a chapter of the book. Ms. Brown declined but offered to introduce Dr. Hamilton to a few people she knew would be interested.

42) In 2014 and 2015, Dr. Hamilton hosted several meals at his home to discuss his proposed book and request essay submission. Ms. Brown invited several professors, and a few agreed to participate.

## The Birth of the Legacy program

43) Prior to meeting Dr. Hamilton, Ms. Brown sought to scale the creation of effective living trust planning. Although the concept of using living trusts was catching on with her target clientele, Ms. Brown noticed that some attorneys were drafting living trusts in a manner which would force their clients into probate. There was a need for properly-drafted, affordable living trusts.

44) Ms. Brown desired to develop a software program that would make attorney-drafted, high-quality living trust resources more accessible and less expensive for middle- and lower-income individuals.[4] The program sought to convert attorney-drafted living trust planning into an affordable monthly subscription. In 2014, using her own resources and loans from friends and family, Ms. Brown

---

[4]Ms. Brown drafted a business plan for the software program through her participation in the Goldman Sachs 10,000 Small Businesses Program

16

embarked on the first iteration of the legacy program's software using an overseas software development company.

45) In October 2014, Ms. Brown's legacy program concept won Ms. Brown first place in a city-wide business pitch competition hosted by the University of Chicago.

## Raising Capital

46) In or about December 2014, the overseas software company Ms. Brown hired to create the first iteration of the Legacy software sought additional funds to complete the project. Ms. Brown worked with another company in the University of Chicago entrepreneurship incubator to assess the quality of the overseas company's work and determine a path to complete the software. Ms Brown determined that she needed to raise an additional $25,000 in capital to finish the minimum viable product version of Legacy's software.

47) Ms. Brown decided to attempt to raise the capital through crowdfunding. Ms. Brown created a crowdfunding site then emailed a fundraising request to her email distribution list of more than 5000 individuals.

48) Dr. Hamilton was on Ms. Brown's email distribution list and learned of Ms. Brown's fundraising efforts through the crowdfunding email. In or about March 2015, Dr. Hamilton began repeatedly

17

offering to donate the entire $25,000 to Ms. Brown as a gift. However, Ms. Brown refused to accept the large gift because Dr. Hamilton was a former client and because of his age.

49) Following Ms. Brown's repeated refusals, Dr. Hamilton asked Ms. Brown to discuss the legacy program's financial needs with his business manager. Ms. Brown remained apprehensive but agreed to make a formal presentation regarding the legacy program to Dr. Hamilton's business manager.

50) Defendant Goldston made several recommendations regarding the legacy program, each recommendation was based on starting the development process anew and contracting with a software developer in the United States. At the conclusion of the presentation, Defendant Goldston requested that Ms. Brown calculate the capital needed to implement Defendant Goldston's recommendations.

51) Factoring in Defendant Goldston's recommendations, Ms. Brown determined that $125,000 in capital was required. As requested, Ms. Brown made a second formal presentation to Defendant Goldston, which Dr. Hamilton attended. Following the presentation, Defendant Goldston stated:

18

A. Dr. Hamilton wanted to invest the entire $125,000 in capital and he wanted 25% ownership of the business in exchange for his investment;

B. that a new business entity would need to be formed for the venture;

C. that the operating agreement would need to include a provision stating that:

    i.   Ms. Brown could not seek additional investors without first receiving approval from Dr. Hamilton;

    ii.   Dr. Hamilton would have the right of first refusal to provide debt financing and purchase additional equity.

52) Ms. Brown remained hesitant about allowing Dr. Hamilton to invest. It was important to Ms. Brown to ensure that there was no impropriety nor any appearance of impropriety. In addition, although Dr. Hamilton was in good cognitive health at the time, Ms. Brown was concerned that his cognitive health might deteriorate.

53) Ms. Brown discussed this, along with Ms. Brown's conflicts of interest, with Defendant Goldston. Ms. Brown's conflicts included:

A. Ms. Brown was Dr. Hamilton's former attorney,

B. Ms. Brown's family trust (BW Trust) was the current owner of the business, and,

19

C. Ms. Brown was the trustee of the BW Trust and the manager of the business.

54) Ms. Brown provided Defendant Goldston with a memorandum of understanding outlining her concerns and conflicts and she asked Defendant Goldston to discuss the conflicts with Dr. Hamilton.[5]

55) Defendant Goldston attempted to alleviate Ms. Brown's concerns about Dr. Hamilton investing in the legacy program software. Defendant Goldston informed Ms. Brown that:

A. Dr. Hamilton's desire to invest in the legacy program software was part of his larger campaign to invest in women-owned businesses to honor his late daughter, who was an entrepreneur;

B. Dr. Hamilton had already funded two women-owned businesses, one being Defendant Goldston's business. The legacy program software would be the third woman-owned business Dr. Hamilton funded;

C. Dr. Hamilton intended to invest up to $500,000 in women-owned businesses and he decided to amend his estate planning to fund a foundation supporting women-owned businesses.

---

[5]Exhibit

56) A few days after the meeting, Defendant Goldston confirmed to Ms. Brown that Defendant Goldston and Dr. Hamilton discussed the various points in the memorandum of understanding and they had consulted Dr. Hamilton's other advisors. Defendant Goldston confirmed that Dr. Hamilton would be signing the memorandum and wanted to move forward with an investment in the legacy program software.

57) Ms. Brown stated that she was willing to accept Dr. Hamilton's offer to purchase equity if Dr. Hamilton agreed to several conditions:

A. Dr. Hamilton would be prohibited from hiring Ms. Brown as his attorney in the future;

B. Ms. Brown would work directly with Defendant Goldston (Dr. Hamilton's business manager) regarding business matters, rather than working with Dr. Hamilton;

C. Dr. Hamilton would not invest the $125,000 as a lump sum, which is what Dr. Hamilton wanted to do. Instead, Dr. Hamilton would invest the capital as needed and only after Defendant Goldston reviewed and approved the company's previous expenditures; and,

21

D. Both Defendant Goldston and Dr. Hamilton would attend a monthly progress meeting for Ms. Brown to provide them with an update on the company's progress.

58) Dr. Hamilton and Defendant Goldston agreed to Ms. Brown's conditions. Ms. Brown began the process of creating a new company for the venture.

59) Shortly after Ms. Brown agreed to accept Dr. Hamilton's investment, Dr. Hamilton's wife passed away. Ms. Brown contacted Defendant Goldston and offered to void the deal with Dr. Hamilton if Dr. Hamilton wished to cancel it because of his wife's death. Defendant Goldston responded that Dr. Hamilton remained just as interested in pursuing the business venture as he was before.

60) The paperwork for Legacy Complete LLC ("Legacy") was filed on or about May 14, 2015. Ms. Brown organized Legacy as a Nevada limited liability company because of Nevada's favorable LLC laws. Dr. Hamilton's trust received a 25% ownership interest in Legacy, with the remaining 75% held by BW Trust. This 75%-25% ownership structure remains unchanged.[6]

61) Prior to the formation of Legacy, Defendant Goldston and Ms. Brown approved the operating budget, which provided that Ms.

---

[6]Legacy lost its limited liability company status for failing to pay its annual fee to the Nevada Department of Business Services.

Brown, who was not an owner of Legacy, would initially receive a $100,000 annual salary, plus bonuses, in return for her work as manager of Legacy.

62) However, shortly after forming Legacy, Ms. Brown discovered that she failed to account for the repayment of loans made to Legacy's predecessor company in her capital calculation for Legacy. Ms. Brown pointed this error out to Defendant Goldston and they agreed that Ms. Brown's compensation would be deferred so that those funds could be used to repay the $35,000 in loans. They also agreed that Ms. Brown's deferred compensation would be paid to Ms. Brown once an accountant was retained and Legacy's software was launched. However, since Legacy's software never launched and an accountant was not retained, Ms. Brown was never paid her deferred compensation. [7]

63) Ms. Brown was committed to providing full financial transparency for Defendant Goldston and Dr. Hamilton. On a monthly basis, Ms. Brown diligently prepared fully reconciled financial account statements for each of Legacy's bank accounts using QuickBooks. Ms. Brown delivered the reconciled statements, along with a copy of the

---

[7]Ms. Brown worked full-time for Legacy for nearly two years, typically working 60-80 hour per week. However, Ms. Brown received less than twenty thousand dollars ($20,000) in net compensation for the two years, which is less than 10% of the compensation she was due.

23

month's disbursements, to Defendant Goldston during their monthly meetings. In addition, Dr. Hamiltonwas added as a signatory on Legacy's bank accounts so that Dr. Hamilton and Defendant Goldston would have full access to the bank accounts to independently audit them if they so desired.

64)     As previously agreed, prior to delivering each of Dr. Hamilton's partial capital contribution checks, Defendant Goldston reviewed and verbally approved each of Legacy's reconciled financial accounts from previous months.

**Legacy Hired Kohmedia**

65)     One of the first actions Ms. Brown took after Legacy was formed was to hire a local software developer to build Legacy's software.[8]

66)     On or about June 11, 2015, Ms. Brown executed a written contract for Defendant Kohmedia to build the App ("Kohmedia Contract"), a Chicago software development firm.   Legacy and Defendant Kohmedia also executed the Reciprocal Confidentiality and Nondisclosure Agreement ("Kohmedia Confidentiality Agreement").[9]

---

[8]The version of Legacy's software that Defendant Kohmedia built is referred to as the "App".  The version of Legacy's software built by Defendant Bellwether is referred to as the "Redesigned App".  Together the versions are referred to as "Legacy's Software."
[9]Exhibit ___

24

Defendant Kohmedia is owned and operated by John Koht ("Defendant Koht").

67)     The Kohmedia Contract and the Kohmedia Confidentiality Agreement included provisions that required Defendant Kohmedia and its agents to protect and keep confidential Legacy's trade secrets and other intellectual property.

68)     The total amount of the Kohmedia Contract was $40,000. The Kohmedia Contract set forth milestones upon which payments were due to Defendant Kohmedia.  Legacy made all payments to Defendant Kohmedia by or before the milestone dates.  In total, Legacy paid Kohmedia approximately $30,000.

69)     Kohmedia delivered on time and as promised from June 2015 until late October 2015. However, beginning approximately October 26, 2015, Ms. Brown experienced several items of concern.[10]

70)     On or about October 26, 2015, Defendant Kohmedia notified Legacy that Defendant Kohmedia was ready to begin testing the App.  Defendant Kohmedia gave Ms. Brown a series of tasks to complete so that Defendant Kohmedia could move the App's software

---

[10]Defendant Kohmedia's work slowdown and default were during the same time period in which Ms. Brown actively protested then mayor Rahm Emmanel and the Chicago city council for their actions with regard to LaQuan McDonald's murder.  One of the posts she wrote is attached as *Exhibit* __.

25

code to Defendant Kohmedia's testing domain, LC.Kohsvr.net. Ms. Brown completed the steps and Defendant Kohmedia transferred the code to the testing domain. Ms. Brown began preliminary testing of the App.

71)    On or about November 7, 2015, while testing the App, Ms. Brown received an App-generated notification which directed Brown to a different domain. Brown clicked the link and discovered that a clone of the App was running on a second domain, BuildDeployDestroy.com.[11] Ms. Brown attempted to log into the backend of the cloned App, but she was unable to log in.

72)    Ms. Brown contacted Defendant Kohmedia who assured Ms. Brown that installing the software on a second domain was common practice during testing. Defendant Kohmedia represented to Ms. Brown that the BuildDeployDestroy.com domain was just one of the domains it owned and used for internal testing.

73)    Ms. Brown believed Defendant Kohmedia's explanation. The clone of the App remained active on BuildDeployDestroy.com until at least November 23, 2015.

74)    On or about November 16, 2015, Defendant Kohmedia requested an extension to resolve some of the App's glitches

---

[11]Exhibit

discovered during testing. Ms. Brown granted Defendant Kohmedia's extension request.

75) On or about December 1, 2015, Kohmedia installed the App on LegacyComplete.com and Ms. Brown began final testing for the App.

76) However, after the App was installed on LegacyComplete.com, Ms. Brown immediately experienced technical issues. There were more glitches in the final version of the App than there were on previous versions. In addition, Defendant Kohmedia, once quick to repair technical issues, became unresponsive.

77) On or about December 10, 2015, without forewarning or provocation, Defendant Kohmedia contacted Ms. Brown and informed Ms. Brown that Defendant Kohmedia was going to default on the Kohmedia Contract. In addition, Defendant Kohmedia stated that it would not return the $30,000 Legacy had already paid Defendant Kohmedia.

78) Defendant Kohmedia represented to Ms. Brown that Defendant Kohmedia was abandoning the App's code due to staffing challenges. Ms. Brown had no reason to doubt Kohmedia's representation and there was no way to confirm it.

27

79) Ms. Brown notified Defendant Kohmedia that Defendant Kohmedia was in default of the Kohmedia Contract and demanded Defendant Kohmedia cure the default. Defendant Kohmedia refused.

80) Due to financial constraints, Legacy could not both sue Defendant Kohmedia and hire another developer to complete the App. Since the App was nearly ready to launch, Ms. Brown chose to utilize the remaining capital to hire a new developer to fix the design bugs in the App. Defendant Kohmedia agreed to release the App's code to another developer so that Legacy could mitigate damages.

81) Prior to 2023, Legacy believed Defendant Kohmedia's default of the Kohmedia Contract was due to Kohmedia exercising poor business practices. Legacy did not believe that Defendant Kohmedia was engaged in fraud.

## COUNT 1: BW Trust claims Defendant Kohmedia breached the Kohmedia Contract

82) BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

83) BW Trust alleges that Defendant Kohmedia breached the Kohmedia Contract with Legacy. Specifically, BW Trust claims:

A. Legacy and Defendant Kohmedia executed a written contract ("Kohmedia Contract") on or about June 19, 2015.

28

B. In the Kohmedia Contract, Defendant Kohmedia agreed to create an online software application for Legacy, and provide post-launch support for the App. Legacy agreed to pay Defendant Kohmedia $40,000 for its performance under the Kohmedia Contract.

C. Legacy performed its obligations under the Kohmedia Contract by making payments to Defendant Kohmedia in the amount of $30,000. Legacy made each payment by or before the dates the payments were due.[12]

D. By refusing to complete the App and refusing to provide post-launch support as contracted, Defendant Kohmedia did not perform its obligations under the Kohmedia Contract.

E. Legacy repeatedly notified Defendant Kohmedia that Defendant Kohmedia was in default of the Kohmedia Contract and requested that Defendant Kohmedia cure the default.

F. Legacy attempted to mitigate damages by hiring another developer,to complete the App. However, the new developer discovered that the App's code that Defendant Kohmedia transferred was so laden with errors that the developer was

---

[12]Legacy did not pay the remaining amount as it never become due.

29

unable to repair it. Thus, Legacy's damages were not mitigated.

G. Legacy declared Defendant Kohmedia was in default in December 2015 and formally declared Defendant Kohmedia was in breach of contract in February 2018.

84) Defendants Kohmedia's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendants Kohmedia actions in an amount to be proven at trial.

## COUNT 2: BW Trust claims Defendants Kohmedia and Koht misappropriated Legacy's trade secrets (18 U.S.C. 1836)

85) BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

86) BW Trust and Legacy did not discover the injury described in this claim until October 2023 when it was discovered that Legacy's Software had been conveyed to a third party.

87) BW Trust alleges Defendants Kohmedia and Koht intentionally misappropriated Legacy's intellectual property and concealed the misappropriation. Specifically, BW Trust alleges:

30

A. In the written Kohmedia Contract and the Kohmedia Confidentiality Agreement, Defendants Kohmedia and Koht acknowledged the existence of Legacy's intellectual property and trade secrets. In addition, Kohmedia promised not to disclose and to prevent unauthorized access to and use of Legacy's intellectual property.

B. Legacy's App, which Defendant Kohmedia developed, incorporated Legacy's intellectual property and trade secrets.

C. Without Legacy's permission, Defendants Kohmedia and Koht placed a clone of the App's code on an unauthorized domain, BuildDeployDestroy.com.

D. Moreover, without Legacy's permission, Defendants Kohmedia and Koht intentionally allowed unauthorized third parties to access Legacy's intellectual property and the App's code on BuildDeployDestroy.com.

88) Defendants Kohmedia's and Koht's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant l damages as a result of Defendants Kohmedia and Koht actions in an amount to be proven at trial.

31

## COUNT 3: BW Trust claims Defendants Kohmedia and Koht fraudulently concealed their actions

89) BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

90) BW Trust claims Defendants Kohmedia and Koht fraudulently concealed their actions. Specifically, BW Trust claims:

A. BW Trust and Legacy did not discover the injury until October 2023.

B. Defendants Kohmedia and Koht intentionally misrepresented and concealed the material fact that Defendant Kohmedia placed the clone of the App's code on BuildDeployDestroy.com in order to allow unauthorized users to access the App and Legacy's intellectual property.

C. Defendants Kohmedia and Koht intentionally misrepresented to Legacy that Defendant Kohmedia routinely places their software projects under development on two domains during testing in its normal course of business.

D. Moreover, Defendants Kohmedia and Koht intentionally misrepresented to Legacy that the cloned App's code was only accessible to Defendant Kohmedia's internal development team.

32

E. Defendants Kohmedia and Koht intended to deceive Legacy with this concealment and Legacy believed the deception.

F. There was no way for Legacy to discover through reasonable inquiry or inspection that Defendants Kohmedia or Koht was allowing unauthorized individuals to access the App's code.

G. If Legacy had known the truth, Legacy would have acted differently based on that knowledge. Legacy's reliance on the concealed fact led to Legacy's injury.

91) Defendants Kohmedia's and Koht's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant financial damages as a result of Defendants Kohmedia and Koht actions in an amount to be proven at trial.

**COUNTS 4 and 5: BW Trust claims Defendants Kohmedia and Koht violated the Illinois Deceptive Trade Practices Act (815 ILCS 510/1-7) (COUNT 4) and the Illinois Consumer Fraud Act (815 ILCS 505/1-12) (COUNT 5)**

92) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

93) BW Trust claims Defendants Kohmedia and Koht violated the Illinois Deceptive Trade Practices Act and the Illinois Consumer Fraud Act, by taking actions including, but not limited to:

A. Accepting payment from Legacy knowing that they would not deliver the completed App to Legacy;

B. Misrepresenting to Legacy that they were keeping Legacy's trade secrets confidential, then placing the App's code, along with Legacy's trade secrets, on an unauthorized domain accessible to unauthorized individuals;

C. Misrepresenting the reason behind the default of the Kohmedia Contract; and,

D. Accepting compensation for sharing the App's code with unauthorized individuals.

E. Corrupting the App's code that it released to Legacy's new developer such that the App's code was rendered useless.

F. Fraudulently concealing their actions such that Legacy was unable to discern the truth until 2023 when Ms. Brown's discovered TrustandWill.com.

94) The actions of Defendants Kohmedia and Koht were the direct and proximate cause of Legacy's injury. Legacy suffered significant financial damages as a result of Defendants Kohmedia and Koht actions in an amount to be proven at trial.

34

**COUNT 6 and 7: BW Trust claims Defendants Kohmedia and Koht committed mail fraud (Count 6) and wire fraud (Count 7)**

95) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

96) BW Trust claims Defendants Kohmedia and Koht committed fraud via US Mail, phone and the internet by taking actions during the period of June 2015-December 2015 including, but not limited to:

  A. Accepting Legacy's payments on the Kohmedia Contract made via US Mail and electronic transfer even though Defendant Kohmedia and Koht knew they did not intend to release the App to Legacy as contracted;

  B. Hosting daily and weekly meetings over the phone or internet with Legacy's team even though Defendants Koht and Kohmedia knew that Kohmedia would not be releasing the App to Legacy;

  C. Conspiring via phone or internet to give access to the App to unauthorized third parties;

  D. Allowing unauthorized access to the App's code on an unauthorized internet domain;

  E. Conspiring to conceal their fraudulent acts from Legacy via the phone and internet.

35

97) The actions of Defendants Kohmedia and Koht are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendants Kohmedia and Koht actions in an amount to be proven at trial.

**Elder Care Concern**

98) Shortly after Legacy contracted with Defendant Kohmedia, and just a few weeks after Dr. Hamilton's wife passed away, Ms. Brown noticed that the relationship between Defendant Goldston and Dr. Hamilton changed in several ways that concerned Ms. Brown including, but not limited, to the following:

A. It appeared as if Defendant Goldston began to ignore Dr. Hamilton's wishes in favor of her own..[13] [14] [15]

---

[13] For example, Dr. Hamilton adamantly maintained that he did not want to sign with his book publisher until after he completed the two books he was writing because he did not want to be pressured to complete the books. Instead, he wanted to work at a leisurely pace. Defendant Goldston insisted that Dr. Hamilton sign with his publisher immediately. Defendant Goldston scheduled a trip for her and Dr. Hamilton to fly to New York to meet with the publisher. On his return, Dr. Hamilton stated he changed his mind and decided to sign with the publisher.

[14] For example, Dr. Hamilton was adamant that he did not want to write a follow-up to his bestselling book, *Black Power.* However, Ms. Goldston selected a co-author to co-write the follow-up and convinced Dr. Hamilton to co-author it.

[15] For example, following Mrs. Hamilton's death, Defendant Goldston was in charge of planning a memorial service for Mrs. Hamilton. Ms. Brown volunteered to help. However, Defendant Goldston did not seem to want Mrs. Hamilton to have a memorial service. Ms. Brown does not believe

36

B. It appeared as if Defendant Goldston was increasingly making Dr. Hamilton physically dependent on her.[16]

C. It appeared as if Defendant Goldston was causing Dr. Hamilton to question the accuracy of his memory. [17]

D. It appeared as if Defendant Goldston was increasingly asserting more control over Dr. Hamilton's finances and civil rights artifacts.[18]

---

there was a memorial service for Mrs. Hamilton other than a small gathering for the condo association.

[16] For example, Dr. Hamilton had been prescribed physical therapy and he asked Defendant Goldston to schedule his therapy appointments. However, Ms. Goldston kept delaying the scheduling of his physical therapy. Without therapy, Dr. Hamilton began to have difficulty walking the neighborhood to handle his errands and instead Defendant Goldston chauffeured him.

[17] For example, on one occasion when both Ms. Brown and Defendant Goldston were with Dr. Hamilton at his condo, Dr. Hamilton stepped away to take care of something and Ms. Brown went to the bathroom. While Ms. Brown was in the bathroom, Dr. Hamilton returned to his living room and asked Defendant Goldston "where's Kimberly [Ms. Brown]". Defendant Goldston responded to Dr. Hamilton "you mean where's Beverly [a friend of Defendant Goldston]". Dr. Hamilton responded, "no Kimberly." Again, Defendant Goldston corrected him and referenced her friend. Dr. Hamilton stated that he was asking about Ms. Brown who just there, or at least he thought she was just there. Hearing the conversation, Ms. Brown exited the bathroom and interjected that Dr. Hamilton was asking about her, not Beverly.

[18] For example, Dr. Hamilton wanted his civil rights artifacts to be placed in the John Hope Franklin Center and he did not want them placed in DuSable Museum. However, Defendant Goldston wanted to place his artifacts in DuSable. Ms. Brown believes Defendant Goldston transferred several of Dr. Hamilton's artifacts to DuSable Museum.

37

E. It appeared as if Defendant Goldston was increasingly dictating with whom Dr. Hamilton interacted, including dissuading him from seeing some of his family members and friends.[19] Moreover, Defendant Goldston began surrounding Dr. Hamilton with individuals she selected.[20]

F. Ms. Brown grew even more concerned when Dr. Hamilton amended his living trust to add Defendant Goldston as his primary disability trustee and a primary beneficiary.[21] [22]

99) Ms. Brown briefly mentioned her concerns to Dr. Hamilton. Dr. Hamilton stated that he had everything under control.

100) In or about August 2015, Ms. Brown discussed with Defendant Goldston the potential need to sell additional equity to

---

[19] For example, when Dr. Hamilton's niece visited Dr. Hamilton, Defendant Goldston commented to Dr. Hamilton that his niece's motives were not altruistic and discouraged Dr. Hamilton from allowing her to visit again.

[20] For example, during the period that Dr. Hamilton was writing a book on democracy in South Africa, Defendant Goldston asked Dr. Hamilton to pay for a group of people whom Defendant Goldston selected to travel with Dr. Hamilton to South Africa with first class travel and accommodations.

[21] Ms. Brown was not Dr. Hamilton's attorney when he amended his living trust to add Defendant Goldston as a trustee and beneficiary. In addition, Ms. Brown did not receive a referral fee from the attorney who amended Dr. Hamilton's living trust.

[22] After Mrs. Hamilton died, Ms. Goldston repeatedly asked Dr. Hamilton to leave everything to her. Ms. Goldston promised she would distribute everything according to Dr. Hamilton's wishes.

raise capital for Legacy's reserves.[23] Ms. Brown's financial projections showed that Legacy's reserves should be increased in preparation of November's launch of the App. The discussion was preemptive, Legacy's capital had not been exhausted.

101) Without offering any explanation, Defendant Goldston asserted that she was willing to allow the company to fail rather than allow capital to be raised or permit debt financing. In addition, Defendant Goldston requested that Ms. Brown cease formal monthly meetings because she wanted Dr. Hamilton to focus on writing his books.

102) Pursuant to Ms. Goldston's request, on or about August 26, 2015, Ms. Brown hosted her last formal meeting with Defendant Goldston and Dr. Hamilton. During that meeting, Ms. Brown discussed her concerns that Defendant Goldston's actions might not be aligned with Dr. Hamilton's or Legacy's best interests.

103) Moreover, Ms. Brown asserted that Defendant Goldston's actions appeared to be moving towards elder abuse. Ms. Brown provided examples such as those set forth herein. Ms. Brown insisted

---

[23] Legacy's operating agreement provided that Dr. Hamilton had the right of first refusal to purchase additional equity or provide debt-financing to Legacy. In addition, Dr. Hamilton had the right to approve or disapprove the sale of additional equity. Thus, Ms. Brown was required to present the opportunity to buy additional equity, or provide financing, to Dr. Hamilton before Legacy could seek outside investors or financial institutions.

39

that Dr. Hamilton have his attorney work alongside Defendant Goldston to protect his interests. Ms. Brown also discussed that Defendant Goldston's flat refusal to discuss selling additional equity or securing a loan from a financial institution might endanger the viability of Legacy.

104) Defendant Goldston was furious with Ms. Brown for discussing these matters with her in front of Dr. Hamilton. Defendant Goldston threatened Ms. Brown and said Ms. Brown would regret it.

105) Concerned about Defendant Goldston's threat, a day or two after the meeting, Ms. Brown contacted Dr. Hamilton and Defendant Goldston and asked if Dr. Hamilton would be willing to convert his equity interest into a loan or sell his interest.

106) In response to Ms. Brown's request, Dr. Hamilton offered to convert his ownership share into a gift to Ms. Brown, which Ms. Brown could pay forward once Legacy was successful. Ms. Brown stated she refused to accept a large monetary gift from Dr. Hamilton before the company was founded and she continued to refuse to accept Dr. Hamilton's money/equity as a gift.

107) Dr. Hamilton agreed to allow Ms. Brown to either convert his equity into a loan or find a buyer to purchase his interest. Dr. Hamilton also agreed to hire an attorney to assess Defendant

40

Goldston's actions, review his estate plan and handle the equity conversion.

**Defendant Montgomery and Equity-to-Loan Conversion**

108) Heeding Ms. Brown's recommendation, in September 2015, Dr. Hamilton hired Attorney Michelle Montgomery ("Defendant Montgomery"), a partner at James D. Montgomery & Associates, Ltd. ("Defendant Montgomery Firm").[24]

109) According to Defendant Montgomery's retainer letter with Dr. Hamilton, Defendant was retained to take the following actions including:

    A. assessin Defendant Goldston's actions with respect to possible elder care violations,

    B. reviewing Dr. Hamilton's estate planning, and

    C. converting Dr. Hamilton's equity in Legacy to debt.

110) From the outset of her representation of Dr. Hamilton, Defendant Montgomery was antagonistic and accusatory towards Ms. Brown. Shortly after being hired, Defendant Montgomery said that her job was, according to Defendant Goldston, "to clean up Ms. Brown's mess."

---

[24] Exhibit __: Complaint for Brown v. Montgomery at Exhibit __.

41

111) Ms. Brown provided a first draft of proposed equity-to-debt conversion documents to Defendant Montgomery on or about October 19, 2015. Defendant Montgomery asked Ms. Brown to be a guarantor on the proposed note to which Ms. Brown agreed.

112) During the first few weeks of October 2015, it appeared that the equity-to-debt conversion process would be completed by November 2015 which was the projected release date of the App. However, by the end of the month, the equity-to-debt conversion process reached an impasse when Defendant Montgomery insisted that Ms. Brown agree to onerous terms in the personal guaranty.

113) Ms. Brown suggested revisions and emailed proposed loan conversion documents to Defendant Montgomery on or about November 13, 2015.[25] In addition, eager to complete the equity-to-debt conversion, Ms. Brown mailed signed originals of the proposed loan conversion documents to Defendant Montgomery.

114) Ms. Brown did not receive a substantive response from Defendant Montgomery until on or about December 9, 2015, at which point Defendant Montgomery simply rejected the equity-to-debt conversion documents.

---

[25] Exhibit 1 - 2nd Am. Complaint for Brown v. Montgomery at Ex. ____.

115) On or about December 10, 2015, Ms. Brown contacted Defendant Montgomery and requested clarity regarding Defendant Montgomery's objections to the equity-to-debt conversion documents.

116) On that same day (December 10, 2015) or the next, Defendant Kohmedia notified Legacy that it would be defaulting on the Kohmedia Contract because of staffing issues.

117) Defendant Kohmedia's default put Legacy into a difficult position. Without raising additional capital to hire another developer, the App could not be completed and Legacy would fail. Defendant Kohmedia's default made completing the equity-to-debt conversion critical.

118) Ms. Brown informed Defendant Montgomery of Defendant Kohmedia's default and asked Defendant Montgomery to suggest modifications to the loan conversion documents as soon as possible. However, Defendant Montgomery did not provide a substantive response to Ms. Brown until on or about March 4, 2016, nearly four months later.

**COUNT 8: Intentionally Omitted**

43

## COUNT 9: BW Trust claims Defendants Goldston and Montgomery breached their fiduciary duty to Legacy

119) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

120) BW Trust claims Defendants Goldston and Montgomery had a fiduciary duty to Legacy based on the following:

   A. Dr. Hamilton is an owner of Legacy. Dr. Hamilton initially assigned Defendant Goldston as his representative for his Legacy ownership responsibilities.

   B. In approximately October 2015, Dr. Hamilton added Defendant Montgomery as a representative for his ownership responsibilities.

   C. As Dr. Hamilton's representatives, Defendants Montgomery and Goldston inherited Dr. Hamilton's fiduciary duty to Legacy, which included but was not limited to, a duty of loyalty and good faith.

121) BW Trust claims it discovered that Defendants Goldston and Montgomery breached their duty to Legacy because of two occurrences:

   A. Defendant Montgomery's 2020 Response to an ARDC inquiry that Ms. Brown filed ("Montgomery's 2020 ARDC Response"); and,

44

B. Ms. Brown's discovery in 2023 that Legacy's Software was conveyed to a third party ("2023 TrustandWill Discovery").

C. But for these two events, it would have been difficult, if not impossible, for Ms. Brown to have discovered the breach.[26]

122)     Through Montgomery's 2020 ARDC Response[27], BW Trust discovered that Defendants Goldston and Montgomery, at the very least, were negligent in their duties to Legacy by taking actions, including but not limited to:

A. Ignoring the signed equity-to-debt conversion documents that Ms. Brown sent to Defendant Montgomery for Dr. Hamilton's signature;

B. Misrepresenting to third parties that Ms. Brown was the cause of the failed equity-to-debt conversion;

C. Presenting inaccurate information to Dr. Hamilton and his advisors regarding the progress of the equity-to-debt conversion;

D. Sharing false information about Legacy and Ms. Brown with third parties, including regulatory bodies, law enforcement officials and media sources,

---

[26] Ms. Brown also filed a lawsuit in 2020 against Defendant's Montgomery and Goldston that is still ongoing, 1:20-cv-04893.

[27] Exhibit

    E. Launching a disinformation campaign about Legacy's manager, Ms. Brown;

    F. Disparaging the viability of Legacy's Software.

123) Through Ms. Brown's 2023 TrustandWill Discovery, BW Trust became aware of additional breaches of Defendants Montgomery's and Goldston's duties to Legacy, including but not limited to:

    i. Intentionally conspiring to misappropriate Legacy's trade secrets;

    ii. Intentionally conspiring to fraudulently convey Legacy's Software to an unauthorized third party,

    iii. Intentionally conspiring to conceal their actions from Legacy;

    iv. Intentionally concealing their fraudulently acts from Legacy;

    v. Failing to disclose conflicts of interest to Legacy;

    vi. Intentionally causing Legacy to become financially insolvent by:

        1. refusing to complete the equity-to-debt conversion,

        2. preventing Legacy from selling additional equity,

        3. preventing institutional debt financing, and,

46

4. disparaging Legacy and its software to deter a

potential buyer of Dr. Hamilton's equity.

124) The actions of Defendants Goldston and Montgomery are the direct and proximate cause of Legacy's injury. Legacy suffered significant financial damages as a result of Defendants Goldston's and Montgomery's actions in an amount to be proven at trial.

## COUNT 10: BW Trust claims Defendants Goldston and Montgomery misappropriated Legacy's trade secrets (18 U.S.C. 1836)

125) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

126) BW Trust and Legacy did not discover Legacy's trade secrets had been misappropriated until October 2023 when Ms. Brown discovered that Legacy's Software had been conveyed to a third party.

127) BW Trust alleges Defendants Montgomery and Goldston intentionally misappropriated Legacy's Software and concealed the misappropriation. Specifically, BW Trust alleges:

A. As Dr. Hamilton's agents representing his Legacy ownership interest, Defendants Goldston and Montgomery owed a duty to Legacy to keep Legacy's confidential information confidential.

47

B. However, Defendants Goldston and Montgomery assisted in the disclosure of Legacy's trade secrets to unauthorized third parties.

C. Defendants Goldston's and Montgomery's failure to maintain the secrecy of Legacy's trade secrets violates the Defend Trade Secrets Act of 2016.

128) Defendants Goldston's and Montgomery's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendants Goldston's and Montgomery's actions in an amount to be proven at trial.

**COUNT 11 and 12: BW Trust claims Defendants Goldston, Montgomery, Goldston Firm and Montgomery Firm violated the Illinois Deceptive Trade Practices Act (815 ILCS 510/2) (COUNT 11) and the Illinois Consumer Fraud Act (815 ILCS 505/1-12) (COUNT 12)**

129) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

130) BW Trust claims Defendants Goldston, Goldston Firm, Montgomery and Montgomery Firm violated the Illinois Deceptive Trade Practices Act in their representation of Dr. Hamilton's Legacy interest, by taking actions including, but not limited to:

48

A. Intentionally making false statements about Legacy's Software;

B. Misrepresenting the quality of the Legacy's Software to deter potential purchasers of Dr. Hamilton's share;

C. Participating in the unauthorized conveyance of Legacy's Software and its trade secrets to an unauthorized third party;

D. Concealing material facts that would have caused Legacy to take different actions if known;

E. Representing to third parties that their deceptive actions were legitimate;

F. Engaging in unfair business practices intended to harm Legacy;

G. Creating confusion about their authority with respect to Legacy;

H. Engaging in conduct creating likelihood of confusion or misunderstanding regarding the true owner of the Legacy Software and its trade secrets.

131)    Defendants Goldston, Montgomery, Goldston Firm and Montgomery Firm actions were the proximate cause of Legacy's injuries. Legacy incurred significant damages resulting from Defendants Goldston, Montgomery, Goldston Firm and Montgomery

49

Firm violated the Illinois Deceptive Trade Practices Act the amount of which will be calculated at trial.

## COUNT 13 and 14:  BW Trust claims Defendants Goldston and Montgomery committed mail fraud 18 U.S.C. 1341 (Count 13) and wire fraud 18 U.S.C. 1341 (Count 14)

132)    BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

133)    BW Trust claims Defendants Goldston and Montgomery committed fraud via US Mail, phone and/or email during the period of May 2015-January 2017 including, but not limited to Defendants Montgomery and Goldston taking the following actions;

A. Attending phone conferences with Legacy to discuss critical matters related to Legacy's Software, even though Defendants were taking steps to convey Legacy's Software to an unauthorized third party;

B. Negotiating the equity-to-debt conversion via phone and email, even though Defendants were taking steps to convey Legacy's Software to an unauthorized third party;

C. Conspiring via phone, email and internet to give access to the Legacy's Software to unauthorized third parties;

50

D. Permitting unauthorized access to the App via an unauthorized internet domain;

E. Conspiring via phone, email and internet to conceal their fraudulent acts from Legacy;

F. Representing to third parties that Ms. Brown was the cause of the failed equity-to-debt conversion, even though Ms. Brown transmitted signed documents to Defendant Montgomery via US Mail and email on at least two occasions.

134)    Defendants Goldston's and Montgomery's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendants Goldston's and Montgomery's actions in an amount to be proven at trial.

## COUNT 15: Intentionally omitted

**Legacy Contracted Bellwether to Complete Legacy's Software**

135)    Following Defendant Kohmedia's default in December 2015, Ms. Brown immediately began vetting software developers to patch the App's code so that the App could be released. Legacy's

funds were nearly exhausted but Ms. Brown continued to defer her salary to make one final attempt to launch the Legacy Software.[28]

136)     Ms. Brown was referred to software developers Bellwether Creation Company.[29] On or about December 14, 2015, Legacy had Defendant Bellwether sign a non-disclosure agreement ("Bellwether Confidentiality Agreement"). Defendant Kohmedia then released the App's code to Defendant Bellwether.

137)     On or about January 13, 2016, Legacy and Defendant Bellwether executed a written contract for Bellwether to complete the App and provide post launch support ("Bellwether Contract").

138)     Defendant Bellwether initially estimated that they could patch the App and have it ready to launch in late February or early March 2016.

139)     Both the Bellwether Contract and the Bellwether Confidentiality Agreement required Defendants Bellwether, and its owners and employees to protect Legacy's trade secrets and intellectual property and keep them confidential.

140)     In February 2016, Defendant Bellwether notified Ms. Brown that the patched App was ready for testing. However, during

---

[28]Ms. Brown was also paying for Legacy's expenses from her own funds. Ms. Brown maintained a log of the expenses she paid for Legacy on a ledger.
[29] Bellwether Creation ("Bellwether Creation") later merged with Grand Prix Printing ("Grand Prix") are together referenced as "Defendant Bellwether".

testing, it was determined that the App still contained numerous bugs and produced inconsistent results. Defendant Bellwether attributed the results to flaws in Defendant Kohmedia's code.

141) Defendants Vaske and Greeby, two of the owners of Defendant Bellwether, determined the cost to fix the bugs in the App would be exorbitant. Defendants Vaske and Greeby began asking Ms. Brown about the possibility of discarding the existing code base and performing a full rebuild of the App. Defendants Vaske and Greeby were aware of the internal conflict Legacy was experiencing related to raising capital. Defendants Vaske and Greeby asked Ms. Brown to pitch the App to their business partner (hereinafter "Investor") who they said had a history of funding innovative ideas.

142) Ms. Brown pitched Defendants' Investor on or about March 14, 2016. Defendants Vaske and Greeby were in attendance. All agreed that the pitch went well.

143) After the pitch, Defendants Vaske and Greeby requested that Ms. Brown not contact Investor directly. Instead, Defendants Vaske and Greeby wanted Ms. Brown to allow Defendants Vaske and Greeby to use their existing relationship with Investor to negotiate the terms of a deal. Defendants Vaske and Greeby stressed that they helped another client get funding from Investor in that manner.

53

144)     Over the weeks that followed, Ms. Brown allowed Defendants Vaske and Greeby to handle the negotiations with Investor.

145)     The following week, on or about March 21, 2016, Defendants Vaske and Greeby offered to start redesigning the App to avoid losing time waiting on the Investor. Defendants Vaske and Greeby explained to Ms. Brown that the redesigned App[30] would be a derivative of the existing App incorporating Legacy's intellectual property and leveraging trade secrets from the existing App. Defendants Vaske and Greeby stated that, if Investor decided not to invest, they (Defendants Bellwether, Greeby and Vaske) would enter a joint venture partnership with Legacy.[31]

146)     Ms. Brown requested that the existing App be kept active during the construction of the Redesigned App. The existing App had bugs but portions of it could be used for customer feedback. However, Defendants were adamant that the time it would take to service the existing App while building the Redesigned App would

---

[30] The redesigned App created by Defendant Bellwether is referred to as "Redesigned App". The Resigned App together with the App created by Defendant Kohmedia are referred to as "Legacy's Software".

[31] Because Ms. Brown was barred by Defendant Montgomery from raising additional capital or securing debt financing for Legacy, a joint venture was the only viable option available to Legacy that was not prohibited under Legacy's operating agreement.

push the completion of the Redesigned App back months. Defendants gave Ms. Brown their word that completion of the Redesigned App would not take more than 4 weeks and would be ready at the end of April 2016.

147) Without Ms. Brown's approval, and over Ms. Brown's objections, Defendant Bellwether disabled the purchasing mechanism on the App which rendered the App unusable.

148) Shortly after development began on the Redesigned App, Defendants Vaske and Greeby stated that the Investor remained undecided but Defendants Vaske and Greeby were ready to proceed with a joint venture with Legacy.

149) Defendants Vaske and Greeby negotiated the joint venture with Ms. Brown (hereinafter the "Joint Venture"). The terms of the Joint Venture Agreement[32] included, but were not limited to,

    A. Erasing Legacy's anticipated indebtedness to Defendant Bellwether;

    B. Transferring Legacy's ownership of the App's trade secrets and intellectual property to the Joint Venture. In addition, new trade secrets established during the development of the Redesigned App would be owned by the Joint Venture.

---

[32]Exhibit

C. Requiring Defendants Bellwether, Vaske and Greeby to build the Redesigned App and provide post-launch tech support for the Redesigned App.

D. Equity ownership of the Joint Venture was: Legacy (81%) and Defendants Bellwether, Vaske and Greeby (19% total).

150) Defendants Vaske and Greeby asked Ms. Brown to continue deferring her compensation while working on the Redesigned App for the Joint Venture. Since the Redesigned App was targeted to be completed in four weeks, Ms. Brown agreed.

151) Ms. Brown devoted 60-80 hours each week to the Joint Venture performing tasks for the development of the Redesigned App including, but not limited to, copywriting, drafting conditional logic, creating & editing document templates, researching legal issues, preparing training information for consumers and attorneys, preparing marketing material, teaching employees of Defendant Bellwether about related legal concepts and responding to user inquiries.

152) Approximately eight weeks after development of the Redesigned App began, Defendants Vaske and Greeby asked Ms. Brown what she would do if Defendants Vaske and Greeby were to offer to purchase Legacy for $300,000. Ms. Brown responded that

56

she would recommend that Legacy's owners refuse the offer because, notwithstanding her dire personal financial situation, the offer would not make Legacy's owners whole. Ms. Brown reminded Defendants Vaske and Greeby that they valued Legacy's Software at one million U.S. dollars, which valued Legacy's interest at $810,000 not $300,000. Defendants Vaske and Greeby never presented an offer to buy Legacy out.

153) In August 2016, nearly five (5) months after Defendants Vaske and Greeby started developing the Redesigned App, testing was complete and the Redesigned App was finally ready for launch.[33]

154) However, the week before the Redesigned App's first press release was set to be released, Defendants Vaske and Greeby announced that they would not provide technical support for the Redesigned App as required by the Joint Venture Agreement. Defendants Vaske and Greeby claimed that they spent more on the Redesigned App than they anticipated, and they were not willing to provide tech support. Defendants Vaske and Greeby also claimed that they were short staffed and could not afford to hire another developer.

---

[33]Ms. Brown had to defer her compensation from the Joint Venture for six months, not one month as Defendant stated. Ms. Brown never received her deferred compensation from the Joint Venture.

155) Defendants Vaske and Greeby told Ms. Brown that if Ms. Brown wanted the Redesigned App to have tech support, Ms. Brown would need to raise the capital to hire a developer to provide tech support. However, weeks earlier, Defendants Vaske and Greeby expressed that an enterprise-level software application, such as the Redesigned App, was destined to fail without a strong tech support team. Thus, Defendants Vaske's and Greeby's refusal to provide tech support prevented the Redesigned App from launching.

156) Following Defendants Vaske's and Greeby's announcement regarding tech support, Ms. Brown contacted the University of Chicago's entrepreneurship incubator ("U of C Incubator") to determine whether there might be resources to provide tech support for the App. The U of C Incubator's staff connected Ms. Brown to a mentor who owned and managed a successful software development company, Mr. Desai ("Mentor Desai"). During a phone call with Mentor Desai, Mentor Desai offered to provide tech support for the Redesigned App at no upfront cost. This solved the Redesigned App's tech support issue and enabled the Redesigned App to launch.

157) Mentor Desai instructed Ms. Brown to have Defendants Vaske and Greeby transfer the Redesigned App's code to Mentor

58

Desai so that Mentor Desai could familiarize his tech support group with the code. Mentor Desai stated that his team would be ready to provide tech support shortly after receiving the code.

158) Following Ms. Brown's call with Mentor Desai, Ms. Brown called and emailed Defendants Greeby and Vaske to share the good news. Ms. Brown instructed Defendants Vaske and Greeby to transfer the code to Mentor Desai so that the Redesigned App could launch.[34]

159) Receiving no response from Defendants Vaske and Greeby, Ms. Brown called Defendant Bellwether and spoke with Defendant Bellwether employee who confirmed that Defendants Vaske and Greeby received Ms. Brown's messages. However, neither Defendant Vaske nor Defendant Greeby ever responded to Ms. Brown.[35]

160) In September 2016, Ms. Brown notified Defendants Vaske and Greeby that they were in default of the Joint Venture Agreement and the Bellwether Contract and demanded they cure the defaults.

161) Ms. Brown never heard from Defendants Vaske, Greeby or Bellwether again.

162) Since the Redesigned App was 100% complete and ready to launch, Ms. Brown began checking the internet regularly to determine whether Defendants Vaske and Greeby had launched the

---

[34]Exhibit 1: 2nd Am. Complaint for Brown v. Bellwether at Exhibit G.
[35]Exhibit 1: 2nd Am. Complaint for Brown v. Bellwether at Exhibit H.

Redesigned App on their own. However, Ms. Brown was unable to find anything resembling the Redesigned App.

163) Prior to Defendants' Vaske and Greeby's default, Ms. Brown prepared a memo for Defendants Vaske and Greeby that outlined how Legacy's software could be extended into other industries. When Ms. Brown was unable to find anything similar to Legacy's Software in the estate planning realm, Ms. Brown began searching for Legacy Software's modified for the other uses Ms. Brown outlined. Ms. Brown could not find anything comparable.

164) For the first year after Defendants Vaske's and Greeby's default, Ms. Brown searched weekly for software comparable to Legacy's Software. By 2018, Ms. Brown searched monthly for comparable software. By 2020, Ms. Brown searched quarterly. Ms. Brown recognized that the amount of time that had past by then would make it impossible to know definitively whether another application was Legacy's Software.

165) Unable to afford to hire an attorney to represent Legacy in a suit against Defendants Bellwether, Greeby and Vaske, and not being a litigator herself, Ms. Brown could not initiate a litigation on behalf of Legacy until Ms. Brown could hire an attorney.

## COUNT 16: BW Trust claims Defendant Bellwether breached the Bellwether Contract

166) BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

167) BW Trust claims that Defendant Bellwether breached the Bellwether Contract. Specifically, BW Trust alleges:

A. Defendant Bellwether and Legacy signed a written contract in January 2016 to repair the code for the App which Kohmedia had abandoned.

B. Defendant Bellwether was able to repair some of the App's code but was unable to get the App's code to operate consistently.

C. Legacy paid Defendant Bellwether the amounts due to Defendant Bellwether on or before the dates in the Bellwether Contract.

D. Without Legacy's authorization, Defendant Bellwether disabled the repaired portions of the App.

168) Defendant Bellwether disabling the App was the direct and proximate cause of the damages Legacy suffered. Legacy suffered significant damages by Defendant Bellwether's breach of the Bellwether Contract.

61

**COUNT 17: BW Trust claims Defendants Bellwether, Vaske and Greeby breached the Joint Venture Agreement**

169)    BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

170)    BW Trust alleges Defendants Bellwether, Vaske and Greeby breached the Joint Venture Agreement with Legacy. Specifically,

A. Legacy entered a joint venture with Defendants Bellwether to build and operate the Redesigned App. Legacy and Defendants Bellwether, Greeby and Vaske memorialized the joint venture with written terms ("Joint Venture Agreement").[36]

B. Legacy performed its obligations under the Joint Venture Agreement.

C. Defendants Bellwether, Vaske and Greeby built the Redesigned App then refused to allow the Redesigned App to be released. Moreover, Defendants Bellwether, Vaske and Greeby refused to provide technical support post-launch as agreed to in the Joint Venture Agreement.

D. Thus, Defendants Bellwether, Vaske and Greeby failed to perform their duties under the Joint Venture Agreement.

---

[36]Exhibit ___ joint venture agreement

171) Defendants Bellwether's, Vaske's and Greeby's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendants Bellwether's, Vaske's and Greeby's actions in an amount to be proven at trial.

**COUNT 18: BW Trust claims Defendants Bellwether, Vaske and Greeby misappropriated Legacy's intellectual property and trade secrets (18 U.S.C. 1836)**

172) BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

173) Based on belief and information discovered in 2023, BW Trust claims Defendants Bellwether, Vaske and Greeby misappropriated the Joint Venture's and Legacy's intellectual property. Specifically, BW Trust claims:

A. The Redesigned App contained Legacy's intellectual property including, but not limited to, trade secrets from the App and additional trade secrets developed within the Redesigned App.

B. Defendants Bellwether, Vaske and Greeby acknowledged the presence of intellectual property and trade secrets in the Bellwether Contract and the Bellwether Confidentiality Agreement;

C. Legacy's intellectual property was transferred to the Joint Venture pursuant to the Joint Venture Agreement. In addition, new intellectual property created by the Joint Venture was owned by the Joint Venture.

D. Without Legacy's or the Joint Venture's permission, Defendants Bellwether, Vaske and Greeby transferred the code to the Redesigned App and its intellectual property to an unauthorized third party. By this action, the intellectual property was misappropriated.

E. Without Legacy's or the Joint Venture's permission, Defendants Bellwether, Vaske and Greeby intentionally allowed unauthorized third parties to access the Redesigned App's code and its intellectual property.

174) Defendant Bellwether's, Vaske's and Greeby's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendant Bellwether's actions in an amount to be proven at trial.

## COUNT 19: BW Trust claims Defendants Bellwether, Vaske and Greeby fraudulently concealed material facts

175) BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

64

176) Based on information discovered in 2023, BW Trust claims Defendants Bellwether, Vaske and Greeby intentionally and fraudulently concealed material facts from Legacy. Specifically, BW Trust claims:

A. Defendants Bellwether, Vaske and Greeby concealed the material fact that they fraudulently conveyed the Redesigned App's code, and its intellectual property, away from the Joint Venture to an unauthorized third party.

B. Defendants Bellwether, Vaske and Greeby intended to deceive Legacy with this concealment and Legacy believed the deception. There was no way for Legacy to discover the truth through a reasonable inquiry or inspection.

C. Moreover, Ms. Brown filed an Unjust Enrichment Lawsuit against Defendants Bellwether, Vaske and Greeby to discover details about the Redesigned App. However, Defendants Vaske and Greeby evaded service of process. By refusing to accept service of process, Defendants Vaske and Greeby successfully kept material facts concealed.[37]

---

[37] Defendant Bellwether was served. However, Defendant never filed an answer so Ms. Brown was unable to discover details about the Redesigned App.

65

177) If Legacy had known that Defendants Bellwether, Vaske and Greeby conveyed the Redesigned App to a third party or misappropriated trade secrets, Legacy would have acted differently based on that knowledge. Legacy's reliance on Defendants' concealed material facts led to Legacy's injury.

178) Defendant Bellwether's, Vaske's and Greeby's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendant Bellwether's actions in an amount to be proven at trial.

## COUNT 20 and 21: BW Trust claims Defendants Bellwether, Vaske and Greeby violated the Illinois Deceptive Trade  Practices Act (815 ILCS 510/1-7) (COUNT 20) and the Illinois Consumer Fraud Act (815 ILCS 505/1-12) (COUNT 21)

179) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

180) BW Trust claims Defendants Bellwether, Vaske, and Greeby violated the Illinois Deceptive Trade Practices Act and Illinois Consumer Fraud Act by:

A. Accepting Legacy's payment made pursuant to the Bellwether Contract to patch the App's code, then disabling the patched code so Legacy could not use the patched App.

B. Entering a joint venture with Legacy even though Defendants Vaske and Greeby knew that they planned to fraudulently convey the Redesigned App to a third party;

C. Misrepresenting access given to unauthorized third parties to the Redesigned App's code;

D. Misrepresenting the reason behind the default of the Bellwether Contract and the default of the Joint Venture Agreement;

E. Participating in the unauthorized transfer of the Redesigned App and its trade secrets to an unauthorized third party.

181) Legacy did not become aware of the injury until after Ms. Brown discovered TrustandWill.com in or about October 2023.

182) Defendant Bellwether's, Vaske's and Greeby's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendant Bellwether's actions in an amount to be proven at trial.

## COUNT 22 and 23: BW Trust claims Defendants Bellwether, Vaske and Greeby committed mail fraud (COUNT 22) and wire fraud (COUNT 23)

183) BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

184) BW Trust claims Defendants Bellwether, Vaske and Greeby committed fraud via US Mail, phone and/or email during the period of January 2016-January 2018 including, but not limited to:

A. Attending phone conferences with Legacy to discuss critical matters related to Legacy's Software, even though they were taking steps to convey Legacy's Software to an unauthorized third party;

B. Conspiring via phone, email and internet to give access to the Legacy's Software to unauthorized third parties;

C. Permitting unauthorized access to the App via unauthorized domain on the internet;

D. Conspiring via phone, email and internet to conceal their fraudulent acts from Legacy;

E. Accepting payments from Legacy made via internet or US Mail;

F. Intentionally emailing to Ms. Brown items which opened certain ports on Ms. Brown's devices and networks, then exfiltrated, corrupting and altering data on Ms. Brown's network and devices.

68

G. Orchestrating persistent denial-of-service attacks against Ms. Brown's networks and devices to prevent Ms. Brown from accessing certain domains.

185) Defendants Bellwether's, Vaske's and Greeby's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendants Bellwether's, Vaske's and Greeby's actions in an amount to be proven at trial.

## COUNT 24: Defendants Bellwether, Vaske and Greeby breached their fiduciary duty to Legacy and the Joint Venture

186) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

187) BW Trust claims that Legacy and Defendants Bellwether, Vaske and Greeby were partners in the Joint Venture. Prior to the Joint Venture, Defendant Bellwether was a service provider for Legacy.

188) BW Trust claims that, because of those relationships, Defendants Bellwether, Greeby and Vaske owed duties of good faith and fair dealing to Legacy and the Joint Venture.

189) BW claims that Defendants Bellwether, Vaske and Greeby breached that duty by:

69

A. Usurping Legacy's Manager's time and energy to create additional content and trade secrets for Legacy's Software, knowing that Defendants were going to fraudulently convey Legacy's Software to an unauthorized third party;

B. Sharing Joint Venture's team meetings with unauthorized third parties;

C. Meeting with unauthorized individuals to discuss Legacy's Software code and its progress;

D. Conspiring to misappropriate Legacy's trade secrets;

E. Misappropriating Legacy's trade secrets;

F. Failing to safeguard Legacy's or the Joint Venture's confidential information,

G. conspiring to fraudulently convey Legacy's Software to an unauthorized third party;

H. fraudulently conveying Legacy's Software to an unauthorized third party;

I. concealing, and conspiring to conceal, their fraudulent acts from Legacy;

J. failing to disclose material facts to Legacy;

K. failing to avoid conflicts of interest that compromised their loyalty to Legacy and the Joint Venture;

70

L. seizing profit opportunities for themselves that belonged to the Joint Venture; and,

M. acting in their own self-interest other the Joint Venture's business interests.

190) BW Trust did not, and could not, have discovered this information until Legacy discovered Legacy's Software had been fraudulently conveyed to an unauthorized party in 2023.

191) Defendants Bellwether's, Vaske's and Greeby's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of Defendants Bellwether's, Vaske's and Greeby's actions in an amount to be proven at trial.

**Ms. Brown's Unjust Enrichment Lawsuit Against Bellwether**

192) Ms. Brown attempted to contact Defendants Vaske and Greeby for several months after they refused to release the Redesigned App.

193) On or about January 7, 2017, Ms. Brown reported Defendants Vaske and Greeby's actions to the Chicago Police Department. Ms. Brown is not aware of whether a police investigation was initiated.

194) On or about that same day, Ms. Brown filed a lawsuit against Defendants Bellwether, Vaske and Greeby, pro se, for unjust

71

enrichment related to her deferred compensation ("Unjust Enrichment Lawsuit", Cook County Illinois, Law Division, 2017-L-000203).

195) Ms. Brown was able to serve the Unjust Enrichment Lawsuit complaint on Defendant Bellwether's registered agent. However, even though the office building in which Defendant Bellwether's office was located spans the entire block, the Cook County Sheriff's Department was unable to locate the building to serve Defendants Vaske and Greeby. Ms. Brown also attempted to serve the complaint on Defendants Vaske's and Greeby's at home and work via U.S. Mail. Each attempt to utilize the US Mail to serve the complaint was returned as undeliverable, except one. However, Ms. Brown did not receive the return receipt for the one item that was not returned as undeliverable.

196) Since Defendant Bellwether was properly served and did not answer the Unjust Enrichment Complaint as required, Ms. Brown filed a motion for default judgment against Defendant Bellwether.

72

## COUNT 25: Intentionally omitted

### The Bellwether Judgment

197)     On February 23, 2018, Ms. Brown was awarded default judgment against Defendant Bellwether for $436,000 ("Bellwether Judgment").  However, the judge required that Ms. Brown delete Defendants Vaske and Greeby from the Unjust Enrichment suit before the judge would award a judgment against Defendant Bellwether.  Not being familiar with litigation, and representing herself pro se, Ms. Brown agreed and dismissed Defendants Vaske and Greeby from the Unjust Enrichment Suit.

## COUNT 26: Plaintiffs claim Grand Prix Printing is responsible for Defendant Bellwether's debts and obligations

198)     BW Trust and Ms. Brown re-allege and incorporate by reference each paragraph in this Complaint as if fully set forth here.

199)     Plaintiffs claim that Bellwether Creation Company merged with Grand Prix Printing and Grand Prix Printing is responsible for Bellwether Creation's debts and obligations.  Specifically, Plaintiffs claim:

73

A. In or about May 2016, Defendants Bellwether, Vaske and Greeby represented to Legacy that Defendant Bellwether was reorganizing and that Defendant Bellwether's assets, including its ownership stake in the Joint Venture, would be transferred into another entity.[38]

B. In 2017, Defendants Vaske and Greeby voluntarily dissolved Defendant Bellwether, then merged Defendant Bellwether's assets, including, but not limited to, existing contracts, bank accounts and equipment, with Grand Prix Printing.

C. Grand Prix Printing is owned by Kent Vaske, the father of Defendant Vaske.

D. Grand Prix Printing was aware of Bellwether Creation Company's existing Joint Venture when it merged with Grand Prix Printing and Defendants' Joint Venture equity was transferred to Grand Prix Printing. Moreover, Grand Prix Printing expressed interest in pursuing one of the concepts set forth by the Joint Venture. [39]

E. Grand Prix Printing was aware of Ms. Brown's individual lawsuit against Bellwether Creation and knew that Legacy

---

[38] ***Exhibit from Bellwether*** *complaint which shows discussion of Bellwether reorganizing.* `
[39] Exhibit re father virtual notary

would likely institute a lawsuit against Bellwether Creation as well.

F. Following the merger, Defendant Vaske stopped operating under the Bellwether Creations name but continued servicing existing Bellwether Creations contracts under Grand Prix Printing to ensure uninterrupted service.

200) Plaintiffs claim that since Bellwether Creation merged with Grand Prix Printing, Grand Prix Printing is responsible for Defendant Bellwether's debts and obligations.

## Bellwether Judgment Collections – Defendants Gartner, Kingsley, Merit Law and Kingsley Law

201) Having no experience collecting a judgment, Ms. Brown hired the law firm of Merit Law Group ("Defendant Merit Law") to handle the Bellwether Judgment collection in or about June 2018. Defendant Adam Kingsley of Defendant Merit Law represented Ms. Brown in the Bellwether Judgment collection.

202) Ms. Brown stressed to Defendant Kingsley the importance of collecting the Bellwether Judgment as soon as possible so that Ms. Brown could use the proceeds to hire Defendant Kingsley to file suit against Defendant Bellwether on behalf of Legacy.[40]

[40]Even though Ms. Brown was not obligated to spend her own funds to hire an attorney for Legacy, Ms. Brown planned to do so. However, since she had

203) Defendant Kingsley filed an appearance on the case and was issued one or more citation(s) to discover Defendant Bellwether's assets.[41] He also filed a motion which was scheduled to be heard in August 2018. However, at some point, Defendant Kingsley inexplicably stopped pursuing the Bellwether Judgment collection but he did not notify Ms. Brown.

204) As of the filing of this complaint, Defendant Kingsley and Merit Law, remain the attorney and law firm of record for the Bellwether Judgment collection. However, in the six years since Ms. Brown hired Merit Law to collect the Bellwether Judgment, neither Defendants Kingsley nor Merit Law have collected any of the $436,000 Bellwether Judgment.

205) Because Defendant Kingsley and Merit Law remain listed as the counsel of record, Ms. Brown would not be alerted to any of Defendant Bellwether's creditors who could satisfy the Bellwether Judgment.

206) Prior to hiring Merit Law for the Bellwether Judgment collection, Ms. Brown retained Defendant Merit Law and Defendant

---

exhausted her finances working for Legacy without compensation, she did not have the funds to retain an attorney until the Bellwether Judgment was collected.

[41] *Exhibit . Bellwether Docket*

Kingsley to represent her in a lawsuit against a home contractor who failed to complete repairs to Ms. Brown's home ("Contractor Case").

207)     Prior to retaining Defendant Kingsley on the Contractor Case, Ms. Brown moved for summary judgment and prepared the required information.  Ms. Brown hired Defendant Kingsley to argue the Contractor Case summary judgment motion and provided Defendant Kingsley with the summary judgment binders and original documents.

208)     Defendant Kingsley successfully argued the summary judgment motion and Ms. Brown was awarded summary judgment against Contractor.  However, since Ms. Brown had not included damage calculations, a separate damage prove-up was scheduled.

209)     Ms. Brown continued to retain Defendant Kingsley to represent her in the prove-up hearing for the Contractor Case. Initially, Defendant Kingsley represented that the damages prove-up hearing was scheduled for October 2018.  However, without explanation, the date of damages prove-up was delayed one year, until October 2019. which Defendant Kingsley represented was the earliest date available.

77

210) During the interim, Ms. Brown sold her Chicago home and moved away from Illinois.[42]

211) In or about June 2019, which was approximately one year after summary judgment was awarded to Ms. Brown, Ms. Brown agreed to a settlement amount for the Contractor Case.

212) The settlement amount was less than half of the amount of damages Ms. Brown could prove she incurred. Ms. Brown agreed to the settlement amount because it included an immediate lump sum payment with the remainder being paid in monthly installments. Having received less than $20,000 in compensation from Legacy from 2015-2017 and unable to find employment or revive her law firm, Ms. Brown was in dire financial straits.

213) By this point, June 2019, Defendant Kingsley had resigned from Merit Law and Defendant Gartner of Merit Law was representing Ms. Brown for the Contractor Case settlement.

214) In June 2019, the only agreed-upon settlement terms were the settlement amount and the two-year repayment period. Moreover, the terms were discussed verbally and were not in writing ("Verbal Settlement Agreement").

---

[42] Ms. Brown feared for her safety after having experienced repeated break-ins to her home, being shoved into oncoming traffic several times and being assaulted by a man with a gun while gardening in front of her home.

215) Nonetheless, on or about June 25, 2019, Defendant Gartner attended a motion conference and represented to the court that a settlement agreement had been entered into. Moreover, without Ms. Brown's permission, Defendant Gartner entered into an agreed order with Contractor's attorneys and dismissed the Contractor Case, and the summary judgment award, with prejudice ("Agreed Order").[43]

216) Following his unauthorized dismissal of the Contractor Case, Defendant Gartner told Ms. Brown that he attended the court conference and dismissed the summary judgment award against the Contractor. Ms. Brown demanded Defendant Gartner immediately reverse the dismissal, insisting that the dismissal was premature. Ms. Brown told Defendant Gartner that there was no reason to dismiss the Contractor Case until a written settlement agreement was executed. However, Defendant Gartner refused to reinstate the Contractor Case.

217) Ms. Brown, who was residing in North Carolina at the time, was not present when the Contractor Case was dismissed. Moreover, Ms. Brown did not give Defendant Gartner permission to dismiss the case. However, the Contractor Case docket indicates that Ms. Brown originated the motion to dismiss the Contractor Case on

---

[43]Exhibit – agreed order

79

June 25, 2019.[44] Ms. Brown believes the dismissal order was attributed to Ms. Brown because Defendant Gartner had not filed an appearance to represent Ms. Brown in court.

218) After Defendant Gartner dismissed the Contractor Case based on the Verbal Settlement Agreement, the parties did not reach an agreement on remaining settlement terms. Several months after dismissing the Contractor Case without Ms. Brown's permission, Defendant Gartner withdrew from representing Ms. Brown. Defendant Gartner withdrew:

A. without reinstating the Contractor Case;

B. without returning the damages documentation related to the Contractor Case so that Ms. Brown could attempt to revive the lawsuit to conduct a prove-up hearing;

C. without obtaining a written settlement agreement after dismissing the Contractor Case; and,

D. without ensuring the verbally agreed upon settlement payments would be made to Ms. Brown.

219) In 2020, Ms. Brown filed a malpractice suit against Defendants Gartner, Kingsley, Kingsley Law and Merit Law, in federal court.[45] However, after pending for two and a half years, with 74

---

[44] Exhibit – docket entry showing plaintiff as source of order
[45] Illinois Northern District 1:20-cv-05195.

docket entries, the court dismissed the case for lack of diversity jurisdiction.[46] The court held that Ms. Brown who moved away from Illinois in 2018 and had become a citizen of North Carolina in 2019, had again become a citizen of Illinois in September 2020 when she filed the complaint for the lawsuit.

220) The court directed Ms. Brown to refile the suit before December 21, 2024 in the proper venue. Since the counts against Defendants Gartner, Kingsley, Merit Law and Kingsley Law are intertwined with this suit, Ms. Brown reasserts them in this suit which is before this court based on federal question jurisdiction.

**COUNT 27: Ms. Brown claims Defendants Kingsley, Gartner, Merit Law and Kingsley Law breached their fiduciary duties and committed legal malpractice with regard to the Contractor Case and the Bellwether Judgment collection.**

221) Ms. Brown re-alleges and incorporates by this reference each of the preceding paragraphs as if fully set forth here.

222) Ms. Brown claims Defendants Kingsley, Gartner, Merit Law and Kingsley Law committed legal malpractice with regard to the Contractor Case and with regard to their handling of the Bellwether Judgment collection.

---

[46] Although the case had been pending for two and a half years, the defendants had not answered Ms. Brown's complaint before the case was dismissed.

A. Defendants Kingsley, Gartner, Merit Law and Kingsley Law agreed to represent Ms. Brown in the Contractor Case and in the Bellwether Judgment collections matter. Ms. Brown agreed to compensate the named Defendants.

B. As a result of the attorney-client relationship created by the above conduct of the parties, Defendants Kingsley, Gartner, Merit Law and Kingsley Law had a duty to represent Ms. Brown with reasonable care, skill, and diligence possessed and exercised by a professional attorney in a similar situation. However, each of the named Defendants breached that duty of care, loyalty, honesty, fidelity, and good faith.

C. The conduct alleged in this complaint and concerning the legal services provided by Defendants Kingsley, Gartner, Merit Law and Kingsley Law fell below the applicable standard of care and violated a breach of professional duties owed to Ms. Brown.

223)     Defendants Kingsley, Gartner, Merit Law and Kingsley Law breached their duties owed to Ms. Brown, as follows:

A. Failing to exercise reasonable skill and diligence in doing the acts, or lack thereof, as alleged herein, and failing to exercise such skill, prudence, and diligence as attorneys of ordinary

82

skill and capacity ordinarily possessed by other attorneys of good standing practicing in the same or similar locality under similar circumstances;

B. Violating the standards of professional conduct and ethics, set forth in the Illinois Rules of Professional Conduct;

C. Failing to expeditiously pursue and collect the Bellwether Judgment;

D. Failing to communicate material information to Ms. Brown about the Bellwether Judgment collection;

E. Misrepresenting material information to Ms. Brown about the Bellwether Judgment collection;

F. Failing to respond timely and honestly to Ms. Brown's questions about the Bellwether Judgment collection;

G. Failing to be honest about the work actually performed on the Bellwether Judgment collection;

H. Making unauthorized decisions and taking unauthorized actions in the Bellwether Judgment collection without Ms. Brown's authorization and/or consent;

I. Failing to expeditiously prosecute the Contractor Case;

J. Failing to zealously pursue and competently prosecute the Contractor Case, and ultimately withdrawing from

83

representation, leaving Ms. Brown to represent herself in a complex damage hearing for a breach of contract action;

K. Encouraging Ms. Brown to engage in settlement discussions with Contractor for an amount far less than she would have otherwise received or been awarded had the Contractor Case been properly prosecuted;

L. Misrepresenting material information to Ms. Brown and to the court, including but not limited to, the status of the Contractor Case and settlement;

M. Failing to inform Ms. Brown and the court of material information, including but not limited to, the status of the Contractor Case, settlement discussions, and unauthorized actions Defendants had taken;

N. Failing to communicate material information to Ms. Brown and the court, including but not limited to, the status of the Contractor Case, settlement discussions, and unauthorized actions;

O. Failing to respond timely and honestly to Ms. Brown's questions about the Contractor Case;

P. Failing to be honest about the work actually performed on the Contractor Case;

Q. Concealing and/or withholding material information from Ms. Brown and the court, including but not limited to, the status of the Contractor Case, settlement discussions, and unauthorized actions;

R. Withholding documentation related to the Contractor Case from Ms. Brown;

S. Repeatedly charging Ms. Brown exorbitant, excessive and unauthorized legal fees for legal representation in the Contractor Case;

T. Making unauthorized decisions and taking unauthorized actions in the Contractor Case without Ms. Brown's authorization and/or consent, including but not limited to, dismissing the Contractor Case with prejudice without Ms. Brown's knowledge or consent.

224) It was reasonably foreseeable to Defendants Gartner, Kingsley, Kingsley Law and Merit Law that their breaches would cause Ms. Brown to lose her claims in the Contractor Case and the Bellwether Judgment collection and would cause Ms. Brown to sustain damages.

225) Ms. Brown relied on the representations made by the named Defendants and named Defendants acted to the detriment of

Ms. Brown's causes of action in the Contractor Case and the Bellwether Judgment collection. As a result of the named Defendants' breach, Ms. Brown is barred and precluded from pursing the valid claims she had brought against Contractor and won on liability at summary judgment. But for the named Defendants' breaches, Ms. Brown would have recovered damages and experienced one of the two outcomes for the Contractor Case in 2019:

A. If the settlement negotiations were successful, the parties would have executed a settlement agreement and Ms. Brown would have received a monetary settlement amount in 2019[47]; or,

B. If the settlement negotiations were not successful, the parties would have participated in the Contractor Damages Prove-up in October 2019. Ms. Brown would have been awarded damages and reimbursed for attorney's fees and court costs in an amount far in excess of the settlement amount previously offered by Contractor.

226)     As a result direct and proximate result of named Defendants' breaches, Ms. Brown has suffered damages in an amount

---

[47]In 2024, five years later, Ms. Brown was able to reach a settlement with Contractor without the aid of Defendants. However, Ms. Brown could not pursue reviving the prove-up hearing because Defendants did not return the damages documentation to her.

to be proven at trial. Ms. Brown has committed no acts of negligence that contributed to her damages. Defendants are responsible for all of the damages that Ms. Brown could have recovered in the Contractor Case and the amounts she would have collected for the Bellwether Judgment.

227) As a result of Defendants' breach, Ms. Brown sustained substantial financial loss and hardship, pecuniary loss, mental anguish, anxiety and emotional distress. Ms. Brown's injuries also include the full value of her claims, loss of verdict, settlement, or award, and interest that Ms. Brown would have recovered in the Contractor Case and the Bellwether Judgment collection.

228) Defendant Gartner failed to ask or receive Ms. Brown's permission prior to dismiss the Contractor Case. In addition, Defendant Kingsley intentionally stopped the collection process for the Bellwether Judgment without Ms. Brown's authorization. Therefore, Ms. Brown seeks exemplary damages for such conduct on the part of the named Defendants.

229) Defendant Merit Law and Defendant Kingsley Law are equally responsible for the acts of their agents, employees, members, representatives, and Defendants Gartner and Kingsley, as set forth herein.

## COUNT 28: Ms. Brown claims Defendants Gartner, Kingsley, Merit Law and Kingsley Law breached the Merit Contracts

230) Ms. Brown re-alleges and incorporates by this reference each in the preceding paragraphs as if they are fully set forth here.

231) Ms. Brown claims Defendants Gartner, Kingsley, Merit Law and Kingsley Law breached the Merit Contracts. Specifically, Ms. Brown claims:

A. The named Defendants agreed, pursuant to contracts ("Merit Contracts") to provide legal representation to Ms. Brown in connection with the Contractor Case and the Bellwether Judgment collection.

B. Ms. Brown performed all acts under the Merit Contracts which required Ms. Brown's performance.

C. The Defendants breached the Merit Contracts with Ms. Brown by not performing their duties under the Merit Contracts, including but not limited to, failing to exercise reasonable care, skill, and diligence commonly used by attorneys in similar situations providing legal services.

232) As a direct and proximate result of the named Defendants' breach of the Merit Contracts, Ms. Brown has been damaged in an amount to be proven at trial.

88

233) Defendant Merit Law and Defendant Kingsley Law are equally responsible for the acts of their agents, employees, members, representatives, and Defendants Gartner and Kingsley, as set forth herein.

## COUNT 29: Ms. Brown claims Defendants Gartner and Kingsley violated the Illinois Deceptive Trade Practices Act (815 ILCS 510/1-7) (COUNT 29) and the Illinois Consumer Fraud Act (815 ILCS 505/1-12) (COUNT 30)

234) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

235) BW Trust claims Defendants Gartner, Kingsley, Merit Law and Kingsley Law violated the Illinois Deceptive Trade Practices Act and Illinois Consumer Fraud Act by:

A. Accepting Ms. Brown's payment made pursuant to the Merit Contract knowing they would not perform the contracted services;

B. Defendant Gartner misrepresenting that he had authority to dismiss the Contractor case, even though he did not;

C. Misrepresenting to the court that a settlement agreement was entered into, while the parties were still negotiating the settlement;

89

D. Remaining listed on the Bellwether Docket as attorney of record, even though Defendants were no longer actively pursuing the Bellwether Judgment collection.BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

236) BW Trust claims Defendants Bellwether, Vaske, and Greeby violated the Illinois Deceptive Trade Practices Act and Illinois Consumer Fraud Act by:

A. Accepting Legacy's payment made pursuant to the Bellwether Contract to patch the App's code, then disabling the patched code so Legacy could not use the patched App.

B. Entering a joint venture with Legacy even though Defendants Vaske and Greeby knew that they planned to fraudulently convey the Redesigned App to a third party;

C. Misrepresenting access given to unauthorized third parties to the Redesigned App's code;

D. Misrepresenting the reason behind the default of the Bellwether Contract and the default of the Joint Venture Agreement;

E. Participating in the unauthorized transfer of the Redesigned App and its trade secrets to an unauthorized third party.

237) Legacy did not become aware of the injury until after Ms. Brown discovered TrustandWill.com in or about October 2023.

238) Defendant Bellwether's, Vaske's and Greeby's actions are the direct and proximate cause of Legacy's injury.

239) Legacy suffered significant damages as a result of Defendant Bellwether's actions in an amount to be proven at trial.

240) BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

241) BW Trust claims Defendants Bellwether, Vaske, and Greeby violated the Illinois Deceptive Trade Practices Act and Illinois Consumer Fraud Act by:

A. Accepting Legacy's payment made pursuant to the Bellwether Contract to patch the App's code, then disabling the patched code so Legacy could not use the patched App.

B. Entering a joint venture with Legacy even though Defendants Vaske and Greeby knew that they planned to fraudulently convey the Redesigned App to a third party;

C. Misrepresenting access given to unauthorized third parties to the Redesigned App's code;

91

D. Misrepresenting the reason behind the default of the Bellwether Contract and the default of the Joint Venture Agreement;

242) Defendants Gartner, Kingsley, Merit Law and Gartner Law are the direct and proximate cause of Ms. Brown's injury. Ms. Brown has suffered significant damages as a result of Defendant Bellwether's actions in an amount to be proven at trial.

## COUNT 31 and 32: Ms. Brown claims Defendants Gartner and Kingsley committed mail fraud 18 U.S.C. 1341 (COUNT 31) and wire fraud 18 U.S.C. 1343 (COUNT 32)

243) Ms. Brown re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

244) Ms. Brown claims Defendants Gartner and Kingsley committed fraud via US Mail, phone and/or email during the period of May 2018 - September 2019 including, but not limited to Defendants Gartner and Kingsley taking the following actions;

A. Attending phone conferences with Ms. Brown to discuss critical matters related to the Bellwether Judgment collection, even though Defendants were not taking steps to collect the Bellwether Judgment;

92

B. Informing Ms. Brown via phone and email that the prove-up hearing had been rescheduled for more than 16 months after the summary judgment award on the Contractor Case, and representing that that was the earliest date available;

C. Discussing with Contractor's attorney the filing of an agreed order to dismiss the Contractor Case via phone or email;

D. Informing Ms. Brown via email that the Contractor Case was dismissed, without obtaining Ms. Brown's permission;

E. Attending phone conferences with Ms. Brown to discuss critical matters related to the settlement of the Contractor Case, even though steps were not being taken to finalize the settlement agreement;

F. Representing to Ms. Brown that the Contractor settlement would begin immediately which was the deciding factor in Ms. Brown accepting the settlement;

G. Representing to Ms. Brown via phone and email that the Contractor's attorneys were not flexible on certain provisions in the settlement agreement;

H. Conspiring with third parties via phone and email to prevent Ms. Brown from receiving the damages she had been

93

awarded in the Bellwether Judgment collection and the Contractor Case.

245) Defendants Gartner's and Kingsley's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of their actions in an amount to be proven at trial.

## COUNT 33: Ms. Brown claims Defendants Gartner and Kingsley violated 18 USC 1512(b)

246) Ms. Brown re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

247) Ms. Brown claims Defendants Gartner and Kingsley obstructed justice pursuant to 18 USC 1512(b). Specifically,

A. Defendant Gartner's actions included but were not limited to:

   i. Providing false information to the court by representing that there was a settlement agreement in place when there was not. The false information was then used to dismiss the Contractor Case, including the summary judgment and the prove-up hearing, with prejudice.

   ii. Providing false information to the court that he had the authority to dismiss the case.

94

      iii. Providing false information to Ms. Brown that dismissing the case before a settlement agreement has been executed is commonplace.

      iv. Providing false information to Ms. Brown that the settlement payments would begin immediately.

      v. Withdrawing before a settlement agreement was signed after dismissing the Contractor Case without permission,

B. Defendant Kingsley actions included, but were not limited to:

      i. Provided false information to Ms. Brown that there was court conference that Ms. Brown was required to fly back to Chicago to attend, which was not true.

      ii. Failed to return summary judgment binders with original documents without which Ms. Brown could not revive the Contractor Case to have the prove-up hearing.

      iii. Remained listed as attorney of record for Bellwether Judgment collection, even after he stopped pursuing collections, which prevented Ms. Brown from receiving notices from Bellwether's creditors.

248) Defendants Gartner's and Kingsley's actions are the direct and proximate cause of Legacy's injury. Legacy suffered significant damages as a result of their actions in an amount to be proven at trial.

95

**COUNT 34: Ms. Brown claims Defendants Merit Law, Kingsley Law, Kingsley and Gartner violated the R.I.C.O Act 18 USC 1962(c) by conducting their affairs thru a pattern of racketeering activities**

249) Ms. Brown re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

250) Ms. Brown claims that it Defendants Kingsley, Kingsley Law, Gartner, and Merit Law conducted business and/or participated in the enterprise's affairs through racketeering activity that affected interstate commerce.

251) **Enterprise:** Defendants Merit Law, Kingsley Law, Kingsley and Gartner operated as an association in fact with respect to Ms. Brown and her interest in the Contractor Case and the Bellwether Judgment.

252) **Continued threat:** Ms. Brown continues to be harmed by the Enterprise:

A. Merit Law remains on the court's docket with respect to the Bellwether Judgment collection which gives the Enterprise the opportunity to continue to provide false information to entities related to the Bellwether Judgment collection.

B. Moreover, in 2024, Ms. Brown completed the settlement of the Contractor Case which Defendant Gartner began in June 2019. Completing the settlement was Ms. Brown's only

96

option since the Enterprise has not returned Ms. Brown's original documents so Ms. Brown could attempt to revive the Contractor Case.

253) **Predicate Acts** The Enterprise carried out the following predicate acts as set forth in Counts herein. Each predicate act was carried out by both Defendants Gartner and Kingsley:

A. Mail fraud, 18 USC 1341

B. Wire fraud, 18 USC 1343

C. Obstructing Justice, 18 USC 1512(b).

254) Ms. Brown claims an unnamed third-party solicited the Enterprise to deprive Ms. Brown from receiving damages she was awarded. The Enterprise's goal was to impoverish Ms. Brown so that she would not have the resources to reclaim Legacy's Software..

255) Defendants Gartner's and Kingsley's actions are the direct and proximate cause of Ms. Brown's injury. Ms. Brown suffered significant financial damages as a result of their actions in an amount to be proven at trial.

**Legacy's Software is being operated as TrustandWill.com**

256) Ms. Brown discovered TrustandWill.com in 2023 when Ms. Brown received an email advertisement from Defendant Gartner

97

that was sent to an email address Ms. Brown no longer uses.[48] Ms. Brown did not remember Defendant Merit Law having an estate planning practice during the period Ms. Brown retained it.

257) Ms. Brown became curious when she noticed the software being advertised seemed similar to Legacy's Software. Ms. Brown clicked the link in the advertisement. However, the link directed her to an error page.

258) Ms. Brown spent a significant amount of time attempting to bypass the error page. Ms. Brown attempted to access the site from several devices, browsers and VPNs, all to no avail.

259) Weeks later, Ms. Brown was finally able to access TrustandWill.com when she utilized several advanced techniques she learned during her cybersecurity graduate studies.

260) When Ms. Brown finally reached TrustandWill.com, it was immediately clear that TrustandWill.com was a later version of Legacy's Software.

261) TrustandWill.com is owned by Huge Legal Inc. out of California. Huge Legal was founded in 2017 and was funded by several venture capital firms and angel investors.[49] Legacy's Software was Huge Legal's only offering until recently.

---

[48]Exhibit
[49]Exhibit

**COUNT 35: BW Trust claims Defendant Huge Legal converted Legacy's Software without authorization**

**COUNT 36: BW Trust claims Defendant Huge Legal has misappropriated Legacy's Trade Secrets**

**COUNT 37 and 38: BW Trust claims Defendant Huge Legal violated the Illinois Deceptive Trade Practices Act and the Illinois Consumer Fraud Act**

**COUNT 39: BW Trust claims Defendant Huge Legal committed wire fraud 18 USC 1343**

**COUNT 40-42: Ms. Brown claims Defendants Merit Law, Kingsley Law, Kingsley and Gartner violated the R.I.C.O Act 18 USC 1962(a) (COUNT 40), 18 USC 1962(b) (COUNT 41), 18 USC 1962(c) (COUNT 42)**

## DAMAGES

Ms. Brown prays for judgment against each named Defendant as follows:

A. That this Court enter judgment in BW Trust/Legacy and Ms. Brown's favor against Defendants, jointly and severally, for all actual, compensatory, exemplary, punitive, and incidental damages provided by law;

B. For damages in an amount which is sufficient to properly and adequately compensate Legacy and Ms. Brown for all direct and proximate losses resulting from Defendants' acts and omissions and for such other and further relief as justice may require;

C. For reimbursement for all attorney's fees and costs;

D. For reimbursement of all contract payments Legacy made;;

E. For prejudgment and post judgment interest;

F. For consequential damages resulting from losses incurred including but not limited to emotional distress, mental pain and anguish,

G. Grant such other and further relief as this Court deems just and proper.

100

***Respectfully Submitted: December 20, 2024***

By:  /s/ Kimberly Jean Brown
Kimberly Jean Brown, Assignee
and Trustee of the Brown
Washington Trust's interest in
Legacy Complete
***Derivative Plaintiff on behalf
of Legacy Complete***


and

/s/ Kimberly Jean Brown,
Kimberly Jean Brown, Individual
1026 E. 46th St, Unit 2E
Chicago, IL. 60653
(773) 673-0324
Kim@PrivacyGladiators.com
***Plaintiff***


This Complaint is related to 1:20-cv-05195 which was terminated
December 21, 2023.

## LIST OF DEFENDANTS - Brown v. Gartner

**Defendant**

**Represented by**

Scott Gartner
c/o Merit Law
345 Park Ave, Suite 7
Antioch, IL 60002

Joseph R. Marconi
Samuel D. Branum
Johnson & Bell, Ltd.
33 W. Monroe St, Suite 2700
Chicago, IL  60603
marconij@jbltd.com
branums@jbltd.com
(312) 372-0770

Michael Greeby
c/o Wilson Sporting Goods
1 Prudential Plaza
130 E. Randolph St.
Chicago, IL 60601

Lila Goldston
Lila Goldston Consulting LLC
5201 S. Cornell, Unit 25D
Chicago,IL  60615

Lee Pulliam
Lee Pulliam and Associates
70  E Lake St, Suite 200
Chicago, IL 60602
(312) 759-8800
Lpulliamlaw@sbcglobal.net

Adam Kingsley
2227 W. Leland Ave
Chicago, IL  60625

Joseph R. Marconi
Samuel D. Branum
Johnson & Bell, Ltd.
33 W. Monroe St, Suite 2700
Chicago, IL  60603
marconij@jbltd.com
branums@jbltd.com
(312) 372-0770

John Koht
520 Rio Vista Rd
Glenview, IL  60025

Brown v. Gartner     Page 1 of 3

| **Defendant** | **Represented by** |
|---|---|
| Michelle Montgomery<br>James D. Montgomery<br>& Associates, Ltd<br>33 W. Monroe, Suite 1375<br>Chicago, IL 60603 | Eric D. Kaplan<br>Christopher S. Wunder<br>Kaplan, Papadakis & Gournis, LLP<br>180 N LaSalle St, Suite 2108<br>Chicago, IL 60601<br>(312) 726-0531<br>ekaplan@kpglaw.com<br>cwunder@kpglaw.com |

Storm Vaske
c/o Grand Prix Printing LLC
4111 NE Bellagio Circle
ANKENY, IA 50021

Erika Williams
704 Pier View Way
Oceanside, CA 92054

Grand Prix Printing LLC
4111 NE Bellagio Circle
ANKENY, IA 50021

Huge Legal Technology Company Inc.
Cody Barbo, CEO
8605 Santa Monica Blvd, Suite 40156
West Hollywood, CA 90069-1094

| | |
|---|---|
| James D. Montgomery<br>& Associates, LTD<br>33 W. Monroe St, Suite 1375<br>Chicago, IL 60603 | Eric D. Kaplan<br>Christopher S. Wunder<br>Kaplan, Papadakis & Gournis, LLP<br>180 N LaSalle St, Suite 2108<br>Chicago, IL 60601<br>(312) 726-0531<br>ekaplan@kpglaw.com<br>cwunder@kpglaw.com |

**Defendant**                          **Represented by**

JP Morgan Chase Co. Inc                Patricia Brown Holmes
270 Park Avenue                        Allison N Siebeneck
New York, NY 10017-2070                Riley Safer Holmes & Cancila LLP
                                       70 W Madison St, Suite 2900
                                       Chicago, IL 60602
                                       (312) 471-8700
                                       PHolmes@rshc-law.com
                                       asiebeneck@rshc-law.com


Kingsley Law Group, PC                 Joseph R. Marconi
C/o Adam Kingsley, CEO                  Samuel D. Branum
2227 W Leland Ave                      Johnson & Bell, Ltd.
Chicago, IL 60625                      33 W. Monroe St, Suite 2700
                                       Chicago, IL 60603
                                       marconij@jbltd.com
                                       branums@jbltd.com
                                       (312) 372-0770


Kohmedia LLC
C/o John Koht, Managing Member
520 Rio Vista Rd
Glenview, IL 60025


Lila E. Goldston Consulting, LLC       Lee Pulliam
Lila E Goldston, Manager               Lee Pulliam & Associates
5201 S. Cornell Ave, Suite 25D         70 E Lake St, Suite 200
Chicago, IL 60615                      Chicago, IL 60602
                                       (312) 759-8800
                                       Lpulliamlaw@sbcglobal.net


Merit Law Group Inc                    Joseph R. Marconi
C/o Scott Gartner, CEO.                 Samuel D. Branum
345 Park Ave Suite 7                   Johnson & Bell, Ltd.
Antioch, IL 60002                      33 W. Monroe St, Suite 2700
                                       Chicago, IL 60603
                                       marconij@jbltd.com
                                       branums@jbltd.com
                                       (312) 372-0770

Case: 1:24-cv-13132 Document #: 1 Filed: 12/20/24 Page 105 of 105 PageID #:105

 

# U.S. MESSENGER
## LOGISTICS MANAGEMENT GROUP

OrderTrackingID: 2454.122024

**Phone:** 630-286-0550

| OrderTrackingID | 2454.122024 | Ref# | Google Search |
|---|---|---|---|
| Ordered By | Kimberly Brown | Ref#2 | |
| Phone | 773-673-0324 | Ref#3 | |
| Round-Trip | N | Ref#4 | |
| Spec Instr | | Pkg. details | 1 |
| Order Date | 12/20/2024 [14:18] | Weight | 5.00 |
| Pickup Date | 12/20/2024 14:18 | Service | Biker 1 - Direct |
| Delivery Date | 12/20/2024 15:48 | Vehicle | Bike |

| Pickup | Delivery |
|---|---|
| **USM**<br>**850 W Jackson Blvd**<br>**Chicago, IL 60607-3032**<br>Contact:  Dispatch<br>Phone:<br>Spec Instr: 200 pages | **Dirsken Federal Building**<br>**219 S Dearborn St 2722**<br>**Chicago, IL 60604-1702**<br>Contact:  clerk of the Court<br>Phone:<br>Spec Instr: Must ask for an invoice so she can pay online take picture of receipt page |

Delivery Signature  X.                    Time        Driver#              Pickup Time

Roundtrip SignatureX.                     Time        Name

### U.S. MESSENGER & LOGISTICS, INC. - LIMITATIONS OF LIABILITY

SHORTAGE/LOSS/DAMAGE SHOULD BE REPORTED WITHIN 48 HOURS OF DELIVERY Shipper acknowledges and agrees that U.S. Messengers rates and charges assessed for handling shipments hereunder are calculated upon the limitations of liability stated below and that, in consideration of the rates and charges assessed, in tendering property to U.S. Messenger for transportation shipper agrees to the following limitations upon U.S. Messenger. 1. No liability for delay or failure to make delivery - U.S. Messengers liability is limited to liability for loss of, damage to or destruction of property occurring while in the custody of U.S. Messenger for the purposes of delivery. U.S. Messenger shall have no liability in any amount relating to, caused by or resulting from delay in completing delivery or failure to complete a delivery. 2. No liability for consequential or incidental damages - U.S. Messenger shall have no liability for any consequential or incidental damages or loss, however arising, whether or not u.s. messenger had or should have had knowledge that such damage might be incurred, including, but not limited to, loss of income, profits, utility, revenue or market. 3. Declaration of value - U.S. Messengers liability shall not exceed $100.00 for any one shipment unless shipper declares in writing on the front of the shipping notice where provided and at time of order placement. A value in excess of $100.00 per shipment, for which there will be assessed and additional charge for such greater valuation at the rate of 0.50 per additional $100.00 of valuation or fraction thereof per shipment. The above provisions are contractual in nature by tendering property to U.S. Messenger for delivery shipper acknowledges due notice of the above limitations of liability and agreement to each provision thereof. QUESTIONS ABOUT U.S. MESSENGERS LIMIT OF LIABILITY SHOULD BE ADDRESSED TO SENIOR MANAGEMENT OF U.S. MESSENGER.

## US Messenger & Logistics, Inc.
### 630-286-0550